IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                    CRIMINAL NO. 04-50 ERIE

JOHN JOSEPH PRICE, JR.

HEARING ON DEFENDANT'S MOTION TO SUPPRESS

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Wednesday, March 8, 2006.

APPEARANCES:
        CHRISTIAN A. TRABOLD, Assistant United States
        Attorney, appearing on behalf of the Government.

THOMAS W. PATTON, Assistant Federal Public
Defender, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1                I N D E X

2

3    WITNESSES:              DIRECT  CROSS  REDIRECT  RECROSS

4

5  FOR THE GOVERNMENT:

6  Randall Schirra          3    23      --      --

7  Ronald Wilson           47    58      69      --

8

9

10

11              - - -

12

13

14    EXHIBITS:

15   (No Exhibits Identified)

16

17

18

19

20

21

22

23                    - - -

24

25


                                3


1                P R O C E E D I N G S

2

3            (Whereupon, the proceedings began at 9:45 a.m., on

4    Wednesday, March 8, 2006, in Courtroom C.)

5

6            THE COURT:  All right, this is the time we set for a

7    suppression hearing at Criminal No. 04-50 Erie.  Are we ready

8  to go?

9        MR. TRABOLD:  Yes, your Honor.

10        THE COURT:  All right.

11        MR. TRABOLD:  The government calls Agent Randall

12  Schirra.

13        RANDALL T. SCHIRRA, GOVERNMENT WITNESS, SWORN

14            DIRECT EXAMINATION

15  BY MR. TRABOLD:

16  Q.   Sir, can you state your name?

17  A.   Agent Randall T. Schirra, Sr., spelling is S-c-h-i-r-r-a.

18  Q.   Where do you work?

19  A.   Pennsylvania Office of Attorney General, Bureau of

20  Narcotic Investigation and Drug Control.

21  Q.   How long have you worked there?

22  A.   Six-and-a-half years.

23  Q.   In what capacity are you currently working there, what is

24  it you do there?

25  A.   I'm an undercover narcotics agent.


                              4


1  Q.   Is that the same type of work you were doing back in

2  October of 2004?

3  A.   Yes, it is.

4  Q.   And specifically on October 5th of 2004, did you arrest

5  an individual -- were you involved in the arrest of an

6  individual by the name of John Price?

7  A.   Yes, I was.

8  Q.   And this is Mr. Price here?

9  A.   Yes, it is.

10  Q.   And that arrest occurred sometime at approximately 6,

11  7 o'clock in the evening?

12  A.   That is correct.

13  Q.   Was Mr. Price arrested for methamphetamine related

14  offenses?

15  A.   Yes, he was.

16  Q.   Where did that arrest occur?

17  A.   In a garage off of Route 97.

18  Q.   Prior to traveling to that location, did you have source

19  information that Mr. Price would be there?

20  A.   Yes, I did.

21  Q.   Separate and apart from that source information, did you

22  have source information that Mr. Price was engaging in

23  methamphetamine activities at his residence?

24  A.   Yes, I did.

25  Q.   And that would be a residence on Page Road in Wattsburg?

5

1  A.   That is correct.

2       THE COURT:  What was the name of the road, Mr.

3  Trabold?

4       MR. TRABOLD:  Page Road.

5  BY MR. TRABOLD:

6  Q.   Is that correct?

7  A.   Yes, sir.

8  Q.   Now, prior to the arrest of Mr. Price for the

9  methamphetamine related offenses, had you had contact with

10  Mr. Price in an undercover type capacity?

11  A.   Yes, I did.

12  Q.   In what regard?

13  A.   I had purchased methamphetamine from Mr. Price.

14  Q.   You yourself?

15  A.   Yes, I did.

16  Q.   And how much prior to the arrest of Mr. Price did that

17  occur, roughly?

18  A.   About a year I think, maybe a little bit more.

19  Q.   So the arrest of Mr. Price occurs sometime around 6,

20  7 o'clock at night on October 5, 2004.  Once Mr. Price is under

21  arrest, what if anything do you do?

22  A.   We secure him, he had actually told us --

23       THE COURT:  Slow down just a little bit for the

24  court reporter.

25       THE WITNESS:  He told us that he was supposed to

6

1  pick up his kids, his wife was working, they'd be home alone.

2  We told him we'd contact his wife, have her go to the residence

3  to take care of the kids.  We left, we secured Mr. Price with a

4  state police trooper, who went and got him arraigned.  Then we

5  went to Mr. Price's residence to check on the kids, to contact

6  his wife.  And because we had information about a possible meth

7  lab there, we wanted to see if we could get consent to search

8  the house.

9  BY MR. TRABOLD:

10  Q.   So with all that you then travel to his residence on Page

11  Road?

12  A.   That is correct.

13  Q.   How many officers go there?

14  A.   There were three initially.

15  Q.   Yourself and who else?

16  A.   Trooper Wilson and Agent Albeck.

17  Q.   What happens when you get to the residence?

18  A.   Myself and Trooper Wilson approached the residence at the

19  front door.  We were met by a female juvenile and a male

20  juvenile, who stated they were both the daughter and son of Mr.

21  Price.  They said neither of their parents were home, their

22  mother was at work, that we could contact their mother at work.

23  We advised them that their father wasn't going to be home like

24  he was supposed to be.

25  Q.   Just so the record is clear, at least the girl that you


                              7


1  had contact with, was roughly around the age of 14 or 15?

2  A.   Fourteen, yes, sir.

3  Q.   These weren't toddler children?

4  A.   No, sir, 14 and 9, I believe, were the correct ages.

5       THE COURT:  This was the daughter of Mr. Price?

6        THE WITNESS:  Yes, sir.

7    BY MR. TRABOLD:

8    Q.    Daughter and son of Mr. Price?

9    A.    Daughter and son.

10        THE COURT:  How old was the son?

11        THE WITNESS:  Nine-years-old, I believe, sir.

12        THE COURT:  Go ahead.

13    BY MR. TRABOLD:

14    Q.    And when you approached the residence the first time and

15    had contact with the children, did any of the officers have

16    their guns drawn or anything like that?

17    A.    No, sir.

18    Q.    And was anyone dressed in SWAT gear or anything like

19    that?

20    A.    No.  I had a T-shirt on and my badge out, it said agent

21    on it, that was it.

22    Q.    Once you had that information from Mr. Price's children,

23    what occurred after that?

24    A.    Trooper Wilson, the daughter gave Trooper Wilson her

25    mother's work phone number.  Trooper Wilson used his cell phone

1    and called, I believe, it was Little Caesar's on Buffalo Road

2    up here in Erie.  Advised her of the situation with Mr. Price

3    being under arrest, he wasn't able to attend to his kids.  She

4    said she would be down in approximately 30 minutes, so we

5    waited for her.

6    Q.    At that point in time, did anyone enter the Price

7    residence?

8    A.    No, sir.

9    Q.    You just waited for her out in the yard?

10   A.    Yes, sir.

11   Q.    Was there something that occurred which delayed Mrs.

12   Price or Mr. Price's significant other from coming to the

13   residence?

14   A.    She claimed she ran out of gas down at the end of the

15   road, so Agent Albeck went down to pick her up.

16   Q.    Then she was brought back to the residence?

17   A.    That is correct.

18   Q.    You played no part in going to pick her up and bringing

19   her back?

20   A.    No, sir.

21  Q.   What happens then when -- and this woman's name is Debbie

22  Fischer?

23  A.   Deborah Fischer, yes, sir.

24  Q.   What happens then when Ms. Fischer gets to the residence?

25  A.   I explained to her that her husband was under arrest for


9


1  a previous warrant for the delivery of methamphetamine to

2  myself.  We advised her that we had prior information that Mr.

3  Price was involved in manufacturing methamphetamine at the

4  residence.  And that we would like to have consent to search to

5  make sure it was a safe environment for her and her children.

6  Q.   And at that point in time did Ms. Fischer provide you

7  verbal consent?

8  A.   Yes, she did.

9  Q.   Did she say anything else with regard, other than

10  providing consent letting you into the residence, did she say

11  anything about her own methamphetamine activities?

12  A.   She said her and Mr. Price do use methamphetamine, but

13  they do not manufacture it.

14  Q.   When you encountered Ms. Fischer when she came on to the

15  property, did you have your gun out?

16  A.   No, sir.

17  Q.   Were you in any way physically imposing to her?

18  A.   No, sir.

19  Q.   Did you lay your hands on her at all?

20  A.   No, sir.

21  Q.   Did you tell her or lead her to believe that she had to

22  consent?

23  A.   No, sir.

24  Q.   Did you mention to her at this point in time with regard

25  to obtaining her consent that if she didn't consent, you were


10


1  just going to go get a search warrant anyway?

2  A.   No, we did not.  It was strictly for the safety of her

3  children.

4  Q.   Did she hesitate at all in providing the consent?

5  A.   No, not at all.

6  Q.   Did she say anything like I want to think about it or I

7  want to talk to John or I'm not sure?

8  A.   No.

9  Q.   What happens then -- just back up for one second.  Where

10  were you on the property when you obtained her verbal consent?

11  A.   Right near the front door.

12  Q.   Were the other officers there with you or were they

13  standing separately?

14  A.   Trooper Wilson was with me.

15  Q.   Did Trooper Wilson in any way coerce Ms. Fischer to give

16  her consent?

17  A.   No, sir.

18       THE COURT:  Let me interrupt for a second.  When you

19  obtained her consent, was it on the front porch or front of --

20       THE WITNESS:  We were actually, there are some steps

21  going up to the front, we were actually down in the driveway,

22  front yard area.

23       THE COURT:  Were the only two officers present with

24  Ms. Fischer at that time, you and the trooper?

25       THE WITNESS:  Yes, sir.  Agent Albeck was in his


11


1  vehicle still.

2       THE COURT:  All right, go ahead.

3  BY MR. TRABOLD:

4  Q.    Would that be the vehicle that you transported Ms.

5  Fischer back to the residence in?

6  A.    That is correct.

7  Q.    What happens then once she agrees to let you into the

8  residence?

9  A.    I follow her into the residence, Trooper Wilson stayed

10  outside.  She showed me a bedroom that had a padlock on the

11  door.  She said that's where her and Mr. Price stayed, that's

12  where they sleep.  She unlocked the door voluntarily, let me in

13  there and said we do use methamphetamine and there might be

14  some pipes in there.  The drawer next to the bed was open, you

15  could see a couple glass pipes in the drawer.

16        THE COURT:  A couple of what?

17        THE WITNESS:  Glass pipes.

18  BY MR. TRABOLD:

19  Q.    Did you seize those then?

20  A.    Yes, I did.

21  Q.    Were you thinking at that point in time that those pipes

22  were methamphetamine pipes?

23  A.    Yes, I was.

24  Q.    Now, prior to your entry into the house, did you tell her

25  what you were going to do when you were in there, did you say


                                    12


1  anything to her like what was going to occur once you went into

2  the house?

3  A.   I told her we were just looking for hazardous materials

4  that might put her and her kids' safety in jeopardy.

5  Q.   And once you found these methamphetamine pipes in the

6  bedroom, what happened after that?

7  A.   I believe I checked a couple more drawers and I found a

8  bag of --

9  Q.   Would looking at your report refresh your recollection?

10  A.   It was a white crystal substance which I believed to

11  be --

12  Q.   Heroin, methamphetamine?

13  A.   No, I knew it was a precursor to making meth.

14  Q.   Okay.  You thought it was something to do with the

15  manufacturing process?

16  A.   Yes.

17  Q.   A listed chemical?

18  A.   Yes.

19  Q.   Sodium hypophosphite?

20  A.   Yes, I'm sorry, thank you.

21  Q.   I just want to back up before we go any further and just

22  cover one thing.  When you go into the house, do you follow Ms.

23  Fischer to the bedroom?

24  A.   Yes.

25  Q.   Do you say to her, hey, I'd like to look in the bedroom?


13


1  A.   No, I asked what this locked room was, she said that's

2  where John and I sleep.

3  Q.   Did you then instruct her to unlock it or did she do that

4  without any prompting from you?

5  A.   I asked her if she had a key, she said yes, and she went

6  and unlocked the door.

7  Q.   But beyond asking her if she had the key, you didn't say

8  let me into that room or anything further than that?

9  A.   No.

10  Q.   You find this baggie of white substance, did you take

11  that into evidence and seize that?

12  A.   Yes.

13  Q.   After you find that, what occurs between you and Ms.

14  Fischer?

15  A.   At that point -- I believe she asked me to stop searching

16  the house part.  Because we found that stuff and she thought

17  she was going to get in trouble.

18  Q.   Okay.  Then what happens after that?

19  A.   Then we left the house.  And we asked her if she had

20  access to the basement from inside the house and she said no,

21  only from the outside of the house.

22  Q.   Did you talk to her about letting you into the basement?

23  A.   Yes, we did.

24  Q.   And what did she say?

25  A.   She directed us down to the side of the house where you

14

1  get into the basement.  There is a garage door and a man door,

2  and she said that she didn't have the key for it, that only Mr.

3  Price had the key for it.

4  Q.   Did she say that she was in the habit of going into the

5  basement and doing work or doing things in the basement?

6  A.   Yes, she said she goes to the basement to do her laundry

7    and that's where they store Christmas items and other things

8    they use throughout the year.

9    Q.    I just want to be clear on a few things with regard to

10    this basement and the garage.  When you go into the garage, do

11    you then have to go down another flight of stairs to get into

12    the basement or are the garage and the basement the same thing?

13    A.    It's all the same thing, it's one big room.

14    Q.    So did she lead you to this area or did you tell her to

15    take you there, how did you get to this area?

16    A.    We asked her how you access the basement.  And she led us

17    down to the side of the house to the basement.

18    Q.    Did she say at this point in time I don't want you going

19    anywhere near the basement or you can't search the basement?

20    A.    No, she just told us she didn't have a key to get in.  We

21    asked her if there was a way to get in, could we get in, she

22    said as long as you don't do any damage to the doors.

23    Q.    Did someone then gain access?

24    A.    Trooper Wilson did.

25    Q.    How did he do that?

15

1   A.   I believe he used a pocket knife.

2   Q.   Was the door damaged in any way?

3   A.   Not at all.

4   Q.   Once the door was opened by Trooper Wilson with the

5   pocket knife, what did you do then?

6   A.   I asked her if I could go in and search the basement

7   area.

8   Q.   What did she say?

9   A.   She said go ahead.

10  Q.   Did you do that?

11  A.   Yes, I did.

12  Q.   What occurred then when you went into the basement,

13  garage area?

14  A.   I started searching, I found a large bag with numerous

15  Sudafed packets in it, which I knew were used in the

16  manufacture of methamphetamine.

17  Q.   And you found other materials related to the manufacture

18  of methamphetamine?

19  A.   Yes, there was some other chemicals and items that were

20  used in the manufacture of methamphetamine.

21  Q.   And when you went into the basement, did you have to --

22  were these items covered up or hidden in any way or were they

23  readily viewable?

24  A.    No, it was actually in a bag right on the side when you

25  went in.  And the bag was actually opened, I could see right in

16

1  it.

2  Q.    So once you find these items, what do you do?

3  A.    I secure the residence.

4  Q.    How did you do that?

5  A.    I advised her that she had to get her kids out, she would

6  have to leave because it was a very potential hazard for the

7  kids because there was chemicals in there.  They posed an

8  explosive hazard, plus the chemicals smell and any other hazard

9  to the children and herself, we'd have to secure it and treat

10  it as a methamphetamine laboratory.

11  Q.    Did you advise her to seek medical treatment or at least

12  an examination of her children?

13  A.    Yes, I did.

14  Q.    At that point in time do you then ask her to sign a

15  written consent?

16  A.   Yes, I did.

17  Q.   What if anything does she say?

18  A.   She denied written consent.

19  Q.   Beyond not being willing to sign a written consent, does

20  she then tell you hey, stop, stop what you're doing?

21  A.   No, she did not.

22  Q.   But she just says she doesn't want to sign a written

23  consent?

24  A.   That is correct.

25  Q.   With that what do you then do?


17


1  A.   I secured the residence with the troopers, we called

2  other agents in.  We secured the residence and I went and

3  applied for a search warrant.

4         THE COURT:  When you say you secured the residence,

5  do you mean you taped around the outside of it?

6         THE WITNESS:  We just had officers out there so no

7  one could enter that house.

8         THE COURT:  All right, go ahead.

9  BY MR. TRABOLD:

10   Q.    Once you have the discussion with her about the written

11   consent, which she then refuses to sign, does anyone go back

12   into the residence or back into this garage, basement area?

13   A.    No, we just had the kids get whatever they needed and got

14   them out of the house.  Of course, she needed another ride to

15   her vehicle, I believe Agent Albeck took her and the kids back

16   to her vehicle and she left the area.

17   Q.    You then obtained a federal search warrant to search the

18   house?

19   A.    That is correct.

20   Q.    Based on the evidence that you located inside the house?

21   A.    Yes, sir.

22   Q.    Prior to going into the basement, did Ms. Fischer tell

23   you in any way, shape or form that she did not want you going

24   in there?

25   A.    No, she did not.


18


1   Q.    With regard to the verbal consent that you obtained when

2   she first got on the property, did you ask her to sign a

3   written consent form?

4   A.   I'm sorry, before we went in the house?

5   Q.   Before you ever went in the house, she gives you verbal

6   consent, did you get a written consent from her?

7   A.   No, we did not.

8   Q.   Why?

9   A.   I didn't have one on me.

10   Q.   Why did you ask her to sign a written consent then

11   subsequent once you found the methamphetamine related

12   materials?

13   A.   Because other officers had arrived that had written

14   consents on their person.

15        THE COURT:  What was the purpose, though, in having

16   her sign the written consent after she had given oral

17   consent -- what was your purpose in having her sign the

18   document?

19        THE WITNESS:  With the written consent I would have

20   felt comfortable securing the residence and treating the

21   hazardous environment immediately, rather than having to wait

22   such a long time to obtain a search warrant.

23   BY MR. TRABOLD:

24   Q.   And was speed of the essence at that point in time?

25   A.   Yes, it is.

19

1  Q.    So you were concerned about making sure that you took

2  care of the hazardous situation?

3  A.    That is correct.

4  Q.    And prior to obtaining -- if you had not found anything

5  in the basement area or anywhere in the house, let's say you

6  don't find any evidence in the house or in the basement, would

7  there have been any reason to memorialize her consent to search

8  the house?

9  A.    No, sir.

10  Q.    Because why?

11  A.    We would have found nothing, no criminal activity.

12  Q.    And did you stop immediately after she provided her

13  consent or, I'm sorry, immediately after she said she didn't

14  want to sign the consent?

15  A.    Yes, sir.

16  Q.    Just so the record is clear, how did it come about -- how

17  did the issue of going into her basement, garage area, how did

18  that happen -- you said you found items consistent with

19  methamphetamine consumption and/or manufacture in the basement,

20  how does it then come about that you then decide you're going

21  to go to the basement, garage area?

22          THE COURT:  You got that wrong, you said you found

23  evidence in the basement, you mean you found evidence in the

24  bedroom.

25          MR. TRABOLD:  I apologize.


                                    20


1  BY MR. TRABOLD:

2  Q.    You find the stuff in the bedroom, how do you get from

3  the bedroom to the basement and how does that topic of the

4  basement even come up?

5  A.    Well, my prior information about Mr. Price's

6  methamphetamine manufacturing --

7          THE COURT:  You got to slow down, Agent, he's going

8  as fast as he can but he can't keep up with you.

9          THE WITNESS:  Sorry about that.  Our prior

10  information about Mr. Price's manufacturing methamphetamine

11  always said he was cooking in the garage, in the basement area

12  of the home.

13  BY MR. TRABOLD:

14  Q.   So did you then bring that up with Ms. Fischer then?

15  A.   I don't believe I did.

16  Q.   How did you get there then?

17  A.   I just asked if there was access to the basement of the

18  home.

19  Q.   Did she kick you out of the house?

20  A.   No.

21  Q.   So she didn't tell you to get out of the house once you

22  found these items, the items that you found in the bedroom?

23  A.   No.

24  Q.   That issue just came up because you suggested it to her?

25  A.   Correct.


21


1  Q.   Okay.

2       THE COURT:  I'm confused on the point, let me ask a

3  couple questions.  I thought, first of all, let me ask you

4  this.  What was the precursor you found in the bedroom?

5       THE WITNESS:  Sodium hypophosphite.

6       THE COURT:  Was that in plain view or did you open a

7  drawer?

8          THE WITNESS:  I opened a drawer on that.

9          THE COURT:  And it was at that point when you found

10   the chemical -- I had in my notes that she indicated that she

11   didn't want you searching the house anymore, is that right?

12          THE WITNESS:  The bedroom anymore.  She didn't want

13   me going through anymore drawers in the bedroom.

14          THE COURT:  Let's do it this way, tell me in your

15   own words precisely what she said to you when you found what

16   you believed to be a precursor for methamphetamine?

17          THE WITNESS:  She asked me to stop searching the

18   drawers of the bedroom.

19          THE COURT:  Then how, it's unclear to me, how did

20   the subject, how did you end up moving from the bedroom to the

21   basement, who brought up the subject of the basement and what

22   was the substance of that conversation?

23          THE WITNESS:  Well, in my mind I pretty much thought

24   I had enough evidence --

25          THE COURT:  Start that over again, I'm having a hard

22

1   time hearing you and I'm sitting right here.

2          THE WITNESS:  Sorry.

3          THE COURT:  Go ahead.

4          THE WITNESS:  In my mind I thought I had enough

5    evidence from what I observed in plain view and in the dresser

6    to get a warrant for Ms. Price.  I knew the hazard, based on my

7    prior information, the main hazard was in the basement.  So I

8    then asked for consent -- or I asked her how do you get to the

9    basement.  I asked her if there was inside access, she said no.

10   I said how do you get there, she said outside.  She asked me to

11   follow her outside, we went around the house down to the

12   basement area.

13         THE COURT:  And did you ask her -- and when you got

14   outside, the door was locked?

15         THE WITNESS:  Yes, sir.

16         THE COURT:  Did you ask her, before attempting to

17   enter or unlock the door, whether she would give consent to

18   search the basement?

19         THE WITNESS:  Yes, she did.

20         THE COURT:  What did you say and what did she say?

21         THE WITNESS:  I said could we have permission to

22   search the basement.  She said if you could get in, you could

23   search it, but she had no key to get in.

24        THE COURT:  Go ahead, Mr. Trabold.

25  BY MR. TRABOLD:


                              23


1  Q.   Just so again the record is clear, did she indicate that

2  as long as the door could be opened yet not damaged, you guys

3  could go into the basement area?

4  A.   That is correct.

5  Q.   That was accomplished?

6  A.   Yes, sir.

7  Q.   By Trooper Wilson?

8  A.   Yes, sir.

9  Q.   Once that occurs, the door is opened, that's when you go

10  in?

11  A.   That is correct.

12  Q.   At no time prior to your entry into the basement, garage

13  area, did Ms. Fischer tell you you can't go in there?

14  A.   That is correct.

15        MR. TRABOLD:  Nothing further, your Honor.

16        THE COURT:  All right, Mr. Patton.

17          MR. PATTON:  Can I have a minute to confer with Mr.

18  Trabold on an issue?

19          THE COURT:  Yes.

20                  CROSS-EXAMINATION

21  BY MR. PATTON:

22  Q.    Agent Schirra, I want to ask you some questions about

23  your arrest of Mr. Price in the auto garage off of Route 97,

24  okay?

25  A.    Okay.


                                24


1  Q.    I want to make sure we don't confuse this location by

2  calling it a garage, with the garage at the Page Road house,

3  okay?

4  A.    Okay.

5  Q.    So this place that's on -- I can't pronounce the name of

6  it, is it Marchmont?

7  A.    Marchmont.

8  Q.    This garage on Marchmont Road, is a garage in the sense

9  of it's an auto garage where automobiles get worked on?

10  A.    That is correct.

11   Q.   It's a business?

12   A.   Correct.

13   Q.   You had information this was a business that Mr. Price

14   ran?

15   A.   Correct.

16   Q.   And you had an arrest warrant for Mr. Price based on a

17   prior delivery of methamphetamine?

18   A.   Yes, sir.

19   Q.   And that happened actually almost a couple years before

20   the events of October 5th of last year?

21   A.   Yes, sir.

22   Q.   Roughly two years between your purchase of

23   methamphetamine from Mr. Price and when this search occurred?

24   A.   Yes, sir.

25   Q.   You went with a number of other agents to the garage on


25


1   Marchmont Road to arrest Mr. Price?

2   A.   That is correct.

3   Q.   Roughly, how many agents did you have with you?

4   A.   I believe there were six of us.

5   Q.    And this auto garage had large overhead doors you had to

6   open up to get access, correct?

7   A.    Correct.

8   Q.    When you got there, one of these doors was open?

9   A.    Correct.

10  Q.    You guys went in to find and arrest Mr. Price?

11  A.    Yes, sir.

12  Q.    Mr. Price, you guys learned, was the only person present

13  in the garage?

14  A.    Yes, sir.

15  Q.    And you found him in an office area in the back part of

16  the garage?

17  A.    Correct.

18  Q.    And got him on the floor, handcuffed him?

19  A.    Yes, sir.

20  Q.    And then took him out of the garage?

21  A.    Yes, sir.

22  Q.    After that was done, you guys were looking for and

23  searched a black backpack, correct?

24  A.    Correct.

25  Q.    You guys had some information that an associate of Mr.

1  Price's, who you believed may be at the garage, had a black

2  backpack that may have firearms in it, is that right?

3  A.   That is correct.

4  Q.   That is information you guys had before you actually got

5  to the garage?

6  A.   Yes, sir.

7  Q.   And based on that information, you searched that

8  backpack?

9  A.   I believe one of the agents saw a firearm magazine in

10  plain view in the netted part of the backpack.

11  Q.   At this point Mr. Price is physically out of the garage

12  handcuffed in your guys' custody?

13  A.   Yes, sir.

14  Q.   There is also a coat that is seen lying by this backpack,

15  correct?

16  A.   Correct.

17  Q.   And the coat is searched, correct?

18  A.   Yes, sir.

19  Q.   And inside a pocket of the coat is a bag that is later

20  determined to have sodium hypophosphite?

21  A.  Correct.

22  Q.  And that bag is in the pocket of the coat?

23  A.  Yes, sir.

24  Q.  Not in plain view?

25  A.  No, sir.


27


1        THE COURT:  Whose coat was it?

2        THE WITNESS:  We believe it was Mr. Price's coat.

3  BY MR. PATTON:

4  Q.   But it was located next to this black bag, that you had

5  information was Mr. Price's associate, Mr. Carr, is that

6  correct?

7  A.   That is correct.

8  Q.   The coat was actually sitting or lying next to the

9  backpack, correct?

10  A.  I didn't find it myself.

11  Q.   Well, you wrote a report summarizing the search, correct?

12  A.  Correct.

13  Q.   Does your report state that "a coat next to a backpack

14  was searched for officer safety and found to contain a plastic

15   baggie with a white crystal substance later determined to be

16   29.3 grams of sodium hypophosphite?"

17   A.   Yes, sir.

18   Q.   After you have effectuated your arrest of Mr. Price at

19   the Marchmont Road garage, you guys huddled up and decided you

20   wanted to try and go to Mr. Price's residence on Page Road in

21   Wattsburg?

22   A.   That is correct.

23   Q.   To try and search the residence, correct?

24   A.   No, our main concern was Mr. Price informed us that he

25   was supposed to pick his children up and that they were home


28


1   alone.  We told him we'd check on the children's safety,

2   contact his wife.  At that time we tried to get consent to

3   search the residence to make sure it was a safe environment.

4   Q.   Do you see the screen here, the screen in front of you,

5   do you see that?

6   A.   No.

7   Q.   Is that screen turned on?

8   A.   No, sir.

9   Q.   Do you see where my pen is?

10  A.   Yes, sir.

11  Q.   Is this the report you wrote?

12  A.   Correct.

13  Q.   Do you see the paragraph where my pen is?

14  A.   Yes, sir.

15  Q.   That paragraph states that PSP, that's Pennsylvania State

16  Police, correct?

17  A.   Correct.

18  Q.   "Informant advised us that he/she knew Price to also cook

19  methamphetamine at his house on Page Road.  This information

20  corroborated information that Agent Schirra has been receiving

21  over the past months in regards to Price having a lab and a

22  stolen ATV at his residence on Page Road.  It was then decided

23  that agents and troopers would go to Price's residence to try

24  and obtain consent to search the residence."  Is that what your

25  report states?


29


1   A.   Yes, sir.

2   Q.   Does your report state anywhere in there that you were

3   going to the residence to tell Mr. Price's children that their

4   dad wasn't going to be home as expected?

5   A.   No, it doesn't say that.

6   Q.   You guys wanted to go and get consent to search the house

7   to try and see if there was a methamphetamine lab there,

8   correct?

9   A.   Sure, yes.

10   Q.   If you found a methamphetamine lab, your intention was to

11   charge Mr. Price with manufacturing methamphetamine?

12   A.   Yes.

13   Q.   Now, I believe you said you had six additional agents

14   along with yourself at the Marchmont Road address?

15   A.   That is correct.

16   Q.   What agencies were these folks from?

17   A.   Attorney General's Office and Pennsylvania State Police.

18   Q.   And the Attorney General's Office, the Bureau of

19   Narcotics Investigation, you guys have preprinted consent to

20   search forms, correct?

21   A.   Yes, sir.

22   Q.   And the Pennsylvania State Police have preprinted written

23   consent to search forms, correct?

24  A.   Yes, sir.

25  Q.   Okay.  So you guys knew you were going to Page Road to


                                30


1   try and do a consent search, right?

2   A.   Correct.

3   Q.   Did you check with anybody who was there to see if any of

4   them had written consent to search forms?

5   A.   No, it's not a required document.

6   Q.   Did you check to see if anybody had one?

7   A.   No.

8   Q.   You didn't have any?

9   A.   No.

10  Q.   You don't carry them with you in your vehicle?

11  A.   No, I don't, I'm undercover.

12  Q.   Mr. Wilson didn't have any in his vehicle?

13  A.   No, he was working undercover as well.

14  Q.   How does that impact whether or not in your vehicle you

15  have --

16  A.   Well, it wouldn't make sense to have a consent to search

17  form in my vehicle when I have bad guys in my vehicle when I do

18  undercover, it would make it obvious I was undercover.

19  Q.    When you went to Marchmont Road, you weren't going to be

20  acting in an undercover capacity on that day, were you?

21  A.    I used my undercover vehicle, yes, I use it all the time.

22  Q.    When you went to Marchmont Road to arrest Mr. Price on

23  October 5th of last year or, excuse me, '04, you weren't acting

24  in an undercover capacity, correct?

25  A.    No.


31


1  Q.    You were going to identify yourself as a police officer

2  and arrest Mr. Price, right?

3  A.    Correct.

4  Q.    Nothing undercover about that?

5  A.    No.  I had no intent of getting consent, either, so I

6  wouldn't have brought my material with me.

7  Q.    When you were going to go to the Page Road address, you

8  weren't going there in an undercover capacity, were you?

9  A.    No, sir.

10  Q.    You were going to go there and announce yourself as a

11  police officer, correct?

12   A.   Correct.

13   Q.   And ask for consent to search?

14   A.   Right.  If I knew I was going to ask for consent, from my

15   office I usually bring my material with me.  I did not come

16   prepared.

17   Q.   Well, you had to contact some officers to try and meet

18   you at the Page Road address, correct?

19   A.   No, not until after we got consent, we called in more

20   officers.  Some of the officers that were at Marchmont went

21   with us to Page Road.

22   Q.   Which ones?

23   A.   Myself, Trooper Wilson, Agent Albeck -- I believe that's

24   it.  I believe the other officers had to all leave.

25   Q.   Trooper Albeck --


                                    32


1   A.   Agent Albeck.

2   Q.   Or Agent Albeck, is he with your guys office?

3   A.   Yes, sir.

4   Q.   What type of work does he do for you guys?

5   A.   He's an undercover narcotics agent.

6  Q.   So you three go to the Page Road address?

7  A.   Correct.

8  Q.   And once you get there, you find that no adults are there

9  and you contact Ms. Fischer trying to get her to come back?

10 A.   Correct.

11 Q.   Now, she has a little trouble getting there, she runs out

12 of gas, she's brought to the house?

13 A.   Correct.

14 Q.   You guys are outside the house and you and Trooper Wilson

15 ask for consent to search?

16 A.   Correct.

17 Q.   You explain to her that you are concerned about there

18 potentially being chemicals there?

19 A.   That is correct.

20 Q.   You tell her that you guys had information that Mr. Price

21 had been manufacturing methamphetamine on the premises?

22 A.   Yes, we did.

23 Q.   You tell her that your information was that that was

24 being manufactured in the basement of the residence?

25 A.   Yes, we did.

1  Q.    And so you told her that your concern was Ms. Fischer and

2  the two children may not be safe?

3  A.    That is correct.

4  Q.    Did you give her any other information about why you were

5  wanting to search?

6  A.    Not that I recall, no.

7  Q.    And so as it was explained to Ms. Fischer was the purpose

8  of the search was to help protect Ms. Fischer and the kids that

9  were on the premises?

10  A.    That is correct.

11  Q.    And Ms. Fischer agreed?

12  A.    Yes, sir.

13  Q.    You go into the house, you notice that one of the bedroom

14  doors -- one of the doors in the house is locked, correct?

15  A.    Yes, it's right off the living room as soon as you go in

16  the house.

17  Q.    And it's locked with a padlock?

18  A.    Yes, sir.

19  Q.    It actually has a hasp put on the door and the doorframe

20  with a padlock locking the door shut?

21  A.    Correct.

22  Q.    And you asked Ms. Fischer about this room?

23  A.    Yes.

24  Q.    You asked her about why it was locked?

25  A.    She said it was hers and Mr.Price's room and the kids had

34

1  no way of getting in there.

2  Q.    And then she just, for unknown reasons, walked over and

3  unlocked the door?

4  A.    I asked her if she would let us in, she unlocked the door

5  and let me in.

6  Q.    You asked her to unlock the door?

7  A.    Correct.

8  Q.    You go in and see two pipes in plain view?

9  A.    Yeah, there was an open drawer next to the bed.

10  Q.    In some kind of dresser?

11  A.    In a little nightstand, I believe it was.

12  Q.    But then you also proceeded to start opening drawers in

13  the bedroom?

14  A.    Correct, there was a bigger dresser against the wall that

15  I started opening dresser drawers of.

16  Q.    And when you explained to Ms. Fischer that you were

17  concerned about her safety and the kids safety, did you explain

18  that was because there may be dangerous chemicals stored

19  somewhere in the house?

20  A.    Yes, sir, I told her, I went into his history of

21  manufacturing methamphetamine.  She said Johnny does not do

22  that, all we do is we use it on occasion.

23  Q.    And your information was that the manufacturing was being

24  done in the basement, correct?

25  A.    Correct.


35


1  Q.    But you start going through the dresser drawers in the

2  bedroom to look for dangerous chemicals used to manufacture

3  methamphetamine?

4  A.    Correct.  People are known to keep chemicals anywhere in

5  the house, manufacturers don't believe there's a hazard.  They

6  work with these chemicals on a daily basis, they see no harm

7  done to themselves, which they don't realize, and they are

8  ignorant about it and keep chemicals everywhere in their

9  residence.

10   Q.   What were the dangerous chemicals you were looking for?

11   A.   Anything.  There's so many different chemicals that can

12   be used.

13   Q.   Give me a list of anything?

14   A.   Iodine, red phosphorous, sodium hypophosphite, acetone,

15   toluene, camp fuel.

16   Q.   So iodine, if you have iodine in your house in the

17   container that it's sold in, that's a dangerous chemical --

18   A.   It's actually an illegal chemical to possess.

19   Q.   It's illegal to possess iodine?

20   A.   Yes, sir -- in crystal form.

21        THE COURT:  Hang on a second, don't talk over each

22   other.

23        THE WITNESS:  The crystal form of iodine that we

24   look for that is used to manufacture methamphetamine, is

25   illegal to possess, it's a list two chemical.


36


1   BY MR. PATTON:

2   Q.   So you can't possess it even if you have no intention of

3   using it to manufacture methamphetamine?

4   A.   Correct.

5   Q.   It's completely illegal to possess?

6   A.   Without a proper license, yes.

7   Q.   What health risks does it pose when it's contained in the

8   container that it's sold in?

9   A.   Usually you don't keep it in the container they sell it

10   in.

11   Q.   What risks does it pose when it's in the container it's

12   sold in?

13   A.   It's very potent, the fumes can irritate you.  It can

14   cause health problems in your lungs and your eyes.

15   Q.   What health risks does it pose if it's in the container

16   that it's sold in?

17        MR. TRABOLD:  Judge, what's the relevance of this,

18   objection, relevancy.  We're here on Ms. Fischer's consent,

19   what is the relevance of the hazards of properly stored iodine.

20        THE COURT:  What is the relevance, Mr. Patton?

21        MR. PATTON:  It's going to the relevance of the

22   conduct that the actions they took which are going to impact on

23   voluntariness of Ms. Fisher's consent.

24        THE COURT:  Well, you got to run that by me again.

25      MR. PATTON:  Their actions, the actions they took,

37

1   what they told her, what they told her they were going to do,

2   what they actually did, impacts on the validity of her consent,

3   on the validity of whether or not her consent was revoked.

4        THE COURT:  All right, go ahead.  Why don't you

5   re-ask the question.

6   BY MR. PATTON:

7   Q.   What health risks does crystallized iodine present when

8   it is stored in the container that it is sold in?

9   A.   None, unless the container is broken.

10  Q.   What health risks does sodium hypophosphite present if

11  it's stored in a container?

12  A.   Probably none if it's in a container.

13  Q.   When acetone is stored in the container it's sold in,

14  like at the Sherwin Williams store up the street here, what

15  danger does that present?

16  A.   None.

17  Q.   You thought you were going to find some dangerous

18  chemicals in the dresser drawers?

19  A.   Yes, it could very well be possible.

20  Q.   So you start looking through the dresser drawers, you

21  find what you believe to be sodium hypophosphite?

22  A.   Correct.

23  Q.   At that point Ms. Fischer says I want you to stop

24  searching?

25  A.   Searching the drawers, yes, she didn't want me going


38


1  through any more dressers.

2  Q.   Well, here's the confusing thing for me, Agent Schirra.

3  On direct the first time you were asked about this, you stated

4  she told us she didn't want us to look in the house anymore.

5  When Mr. Trabold asked you about it the first time, that was

6  your response.  How did you go from she told us she didn't want

7  us looking in the house anymore to, well, no, she just told us

8  that she didn't want us searching any dressers in the bedroom?

9  A.   Then I misspoke with Mr. Trabold.  She did not want me

10  going through any more dressers in that bedroom.

11  Q.   You told her that you thought that this sodium

12  hypophosphite was something that was linked to manufacturing

13  methamphetamine, correct?

14  A.    That is correct.

15  Q.    You in fact said at that time you felt you had probable

16  cause to be able to charge her, correct?

17  A.    That is correct.

18  Q.    With manufacturing methamphetamine?

19  A.    Correct.

20  Q.    And you let her know that, didn't you?

21  A.    Yes, I did.

22  Q.    And that's when she said she didn't want you looking

23  around anymore, isn't it?

24  A.    Yes, it is.

25  Q.    She didn't say I just don't want you looking around in


39


1  the drawers of my house anymore, she said I don't want you

2  looking in the house anymore?

3  A.    No, she actually said I don't want you going through any

4  more drawers.

5  Q.    It was clear to you that she thought she was now in

6  trouble, correct?

7  A.   That is correct.

8  Q.   It was clear to you that she was saying I want you to

9  stop looking because I don't want to get into any more trouble?

10  A.   Okay, yes.

11  Q.   She didn't want you looking around to try and find

12  anything else that was going to get her in more trouble than

13  she already felt she was in?

14  A.   Yes.

15  Q.   And so it's after this exchange occurs, you start asking

16  where's the basement, how do we get to the basement, correct?

17  A.   Correct.

18  Q.   Because you want to search the basement, correct?

19  A.   Correct.

20  Q.   And you've already told Ms. Fischer beforehand that you

21  think that's where or at least the information you have is that

22  that's where Mr. Price was manufacturing his methamphetamine?

23  A.   That is correct.

24  Q.   So you ask her how do you get to the basement?

25  A.   Yes.

40

1  Q.   And ask her if you can get to the basement from somewhere

2  inside the house?

3  A.   Correct.

4  Q.   And that's when she says, tells you you can't get to the

5  basement from inside the house, correct?

6  A.   Correct.

7  Q.   And so you ask her to show you where you get into the

8  basement?

9  A.   Right, we ask her how to get into the basement.

10  Q.   It's after you asked her to show you how you get into the

11  basement that you and her go down, go outside the house and go

12  down to the door into the basement, correct?

13  A.   Correct.

14  Q.   Now, is it accurate to say that the doors, both the

15  overhead door of the basement and the man door into the

16  basement, are on the side of the house?

17  A.   That is correct.

18  Q.   So you take her down there and ask -- or she takes you

19  guys down there in response to your guys' request for her to

20  show you how to get into the basement?

21  A.   Correct.

22  Q.   And you then ask her if she can -- well, you try the door

23  and found out that it was locked, correct?

24  A.    Correct.

25  Q.    And when you found out that the door was locked, you

41

1  asked her if she had a key?

2  A.    Correct.

3  Q.    She said no, I don't have a key?

4  A.    Correct.

5  Q.    And so you then still want to get into the basement,

6  correct?

7  A.    Right.

8  Q.    Because you think there's a meth lab down there, correct?

9  A.    Correct.

10  Q.    And you've already told her that you think there's a meth

11  lab down there?

12  A.    Yes.

13  Q.    This is after she's told you I don't want you to look

14  around for anything that's going to get me into more trouble

15  than I'm already in with the sodium hypophosphite, right?

16  A.    Correct, that was upstairs.

17   Q.   But after you find the sodium hypophosphite, she realizes

18   she's in trouble and you tell her that she's in trouble, she

19   told you to stop looking, correct?

20   A.   Correct, upstairs.

21   Q.   She didn't want you looking in the house, correct?

22   A.   Upstairs, yes.

23   Q.   And you've already told her that you think the meth lab

24   is in the basement, correct?

25   A.   Right.


                                    42


1   Q.   Which is part of the house?

2   A.   It's a separate part of the house, there's no entry from

3   upstairs.

4   Q.   But it's the basement of the house you're in, correct?

5   A.   Correct.

6   Q.   So then she's told you this is -- let me back up for a

7   second.  You guys come down outside?

8   A.   Yes.

9   Q.   You see the overhead door and the man door to the

10   basement?

11  A.   Yes.

12  Q.   You try the man door, correct?

13  A.   Yes.

14  Q.   And find out that it's locked?

15  A.   Correct.

16  Q.   Ms. Fischer is standing watching this as it happens?

17  A.   Correct.

18  Q.   You then ask her if she has the key and she then says no?

19  A.   Correct.

20  Q.   And did you follow-up on that as to whether she has ever

21  had a key to the door?

22  A.   Yes, we asked her if she ever had access to the garage,

23  basement area.  She said yes, that's where I do my wash, that's

24  where we keep Christmas supplies and other decorations and

25  stuff down there.


43


1  Q.   But did you ask her if she ever had a key to that door?

2  A.   I don't recall ever asking her if she ever had a key to

3  that door.

4  Q.   The information you had is she does not have a key to the

5    door, correct?

6    A.    Correct.

7    Q.    But sometimes she does have access?

8    A.    Correct.

9    Q.    Did you ask her how it is she would get access to it if

10    she doesn't have a key to it?

11    A.    No, I didn't.  She said Johnny let her in sometimes, but

12    I don't know if that's all the time or --

13    Q.    She told you that Johnny would let her in?

14    A.    Yes, Mr. Price.

15    Q.    And she told you that Mr. Price had a key to the

16    basement?

17    A.    Correct.

18    Q.    So the basement -- when she had access to the basement,

19    it's when Johnny lets her in?

20    A.    I don't know that.  He does let her in.

21    Q.    She says I have access to the basement?

22    A.    Right.

23    Q.    And she says Johnny lets me in?

24    A.    Correct.

25    Q.    And that she doesn't have a key?

1  A.   She didn't have a key on her at that time.  Whether she's

2  ever had a key or had access to a key when he's home, I don't

3  know.  Maybe he's home and she just gets the key and goes down,

4  I don't know.  At that time she did not have a key.  There were

5  times that Johnny lets her in the basement.  Why, I don't know

6  if she doesn't have a key at the time when he does, I don't

7  know, I'm not there.

8  Q.   So when you're confronted with the situation where you

9  have a locked door to which she does not have a key to, you're

10  then still asking her apparently permission as to whether or

11  not you guys can go in there?

12  A.   Correct.  I asked her if we can obtain entry into there,

13  can we search.  She said yes, as long as you don't damage the

14  door.

15  Q.   And you guys then jimmy the lock?

16  A.   Trooper Wilson got in.

17  Q.   How did he get in?

18  A.   I believe using a pocket knife.

19  Q.   After all this happens, after you go into the basement

20  and you search, it occurs to you at this point in time that,

21  geez, now is a good time to ask for a written consent to do a

22  search that I've already done?

23  A.    After we found everything and secured the residence, I

24  asked her for written consent because by that time we had

25  called other agents in to secure the building.  I asked for

45

1  written consent to save me time from getting a search warrant,

2  applying for the search warrant and getting a search warrant to

3  secure a potentially hazardous area.  It's faster for me to

4  react to a hazardous area with a consent search than applying

5  and obtaining a search warrant.

6  Q.    But you testified that you already had verbal consent?

7  A.    Correct.

8  Q.    So you had verbal consent to search, but you didn't think

9  that verbal consent was good enough to continue the search

10  after you found the meth lab?

11  A.    No, because we wanted to go back through the whole house,

12  including the bedroom, to make sure it was completely secure.

13  Q.    So you thought your ability at that point to search, at

14  least some part of the house, was limited due to Ms. Fischer's

15  revocation of her verbal consent?

16  A.   That is correct.

17  Q.   And so where did you get the written consent form?

18  A.   Like I said, we called other officers and agents to help

19  us secure the residence.

20  Q.   And did you check around with all the ones that had shown

21  up trying to find somebody who had a form?

22  A.   Yes, we did.

23  Q.   Where did you find a form?

24  A.   I don't recall who brought it up.

25  Q.   Was it a BNI form or a PSP form?


46


1  A.   I believe it's a PSP form.

2        THE COURT:  BNI, just for the record?

3  BY MR. PATTON:

4  Q.   Bureau of Narcotics Investigation, correct?

5  A.   Yes, sir.

6  Q.   PSP being Pennsylvania State Police?

7  A.   Correct.

8   Q.   Now, am I accurate in the fact that the written consent

9   form would have stated on there that the person being requested

10  to give consent is not required to give consent?

11  A.   Correct.

12  Q.   And the form also says if you give consent and if we find

13  anything, it could be used against you in court?

14  A.   That is correct.

15  Q.   And it also informs the person that they have the right

16  to discuss the issue with anyone they may choose to discuss it

17  with before deciding whether or not to give consent?

18  A.   Correct.

19  Q.   And when presented with this form, Ms. Fischer said no,

20  I'm not going to sign it?

21  A.   That is correct.

22        MR. PATTON:  May I have a moment, your Honor?

23        THE COURT:  Sure.

24        MR. PATTON:  Those are my questions, your Honor.

25        THE COURT:  Did you have any redirect?


                                47


1         MR. TRABOLD:  No, your Honor.

2          THE COURT:  All right, we'll take a short recess.

3          (Recess from 10:40 a.m.; until 10:50 a.m.)

4          THE COURT:  All right, Mr. Trabold.

5          MR. TRABOLD:  Your Honor, the government calls

6    Trooper Ron Wilson.

7              RONALD WILSON, GOVERNMENT WITNESS, SWORN

8                    DIRECT EXAMINATION

9    BY MR. TRABOLD:

10   Q.   Sir, can you state your name for the record, please?

11   A.   Ronald C. Wilson.

12   Q.   Where do you work?

13   A.   I'm employed with the Pennsylvania State Police.

14   Q.   As a trooper?

15   A.   Yes.

16   Q.   How long have you been a trooper?

17   A.   Twenty-six years.

18   Q.   And were you involved in the investigation of

19   methamphetamine activity by John Price?

20   A.   Yes, I was.

21   Q.   And this is Mr. Price here?

22   A.   That's correct.

23   Q.   Were you involved in the arrest of Mr. Price on October

24  5th of 2004?

25  A.   Yes, I was.


                                48


1  Q.   And Mr. Price was taken into custody at a garage,

2  correct?

3  A.   Yes, on Marchmont Avenue.

4  Q.   Which is roughly off of Route 97?

5  A.   Correct.

6  Q.   And subsequent to the arrest of Mr. Price, did you travel

7  to his residence on Page Road in Wattsburg?

8  A.   Yes, we did.

9  Q.   What was your purpose, as well as the purpose of the

10  other law enforcement officers in going to that residence?

11  A.   We went to that residence to continue an investigation

12  into Mr. Price's involvement in methamphetamine and possibly to

13  see if we could glean any consent search to search his

14  property.

15  Q.   Was there information, separate and apart from the arrest

16  of Mr. Price, that was in law enforcement's possession about

17  methamphetamine activity at his residence?

file:///A|/PRICESUP.TXT

18  A.   Yes, there was.

19  Q.   And do you recall the specific nature of that

20  information?

21  A.   The information and actually there was quite a bit of

22  information gleaned from sources, unidentified informants and

23  concerned citizens about Mr. Price's involvement in

24  methamphetamine.

25  Q.   And the information was that Mr. Price was involved in

49

1  making methamphetamine at his residence?

2  A.   Correct.

3  Q.   Yourself and other law enforcement officers then traveled

4  to the residence?

5  A.   Yes, we did.

6  Q.   Do you recall besides yourself, who else was there?

7  A.   Myself, Agent Schirra, and I believe Agent Tim Albeck.

8  Q.   And when you get to the residence, is there any adult

9  present at the residence?

10  A.   No, we spoke to two juveniles.

11  Q.   And based on what the two juveniles told you, did you

12  then attempt to make contact with a Debbie Fischer?

13  A.   Yes, and we did make contact with her.

14  Q.   And Debbie Fischer has a relationship with Mr. Price?

15  A.   Yes, at that time she was his paramour.

16  Q.   Who contacted Debbie Fischer?

17  A.   I did.

18  Q.   And where did you contact her at?

19  A.   Via telephone at Little Caesar's pizza, her place of

20  employment.

21  Q.   What was the nature of your conversation with her?

22  A.   When we arrived at the residence, we spoke to two

23  juveniles.  And after we ascertained they were juveniles, we

24  asked them where their mother was and could we contact them.

25  They explained where she was and they gave us the number to her

50

1  employment.  I then phoned her, explained that we were at her

2  house and that we would like to talk to her.  She said that she

3  was either on her way home or leaving shortly and she would be

4  there.  At that point in time we backed out of the residence

5  and waited in the driveway.

6   Q.   When you say you backed out of the residence, were you

7   ever in the residence to begin with, what do you mean by that?

8   A.   Just inside the door.

9   Q.   Beyond going inside the door, nobody walked into the

10   residence and looked around when Ms. Fischer wasn't there?

11   A.   No, absolutely not.

12   Q.   So you were in the driveway in your vehicles waiting for

13   her to arrive, did something happen that caused somebody to

14   have to go pick her up?

15   A.   She called me back and said she had run out of gas, her

16   vehicle had run out of gas about a quarter mile from her house.

17   During the time of the wait, we had other agents and troopers

18   that arrived at the scene.  We instructed a couple of those to

19   go and pick her up and possibly give her assistance so she

20   could get her car back to the residence.  We also had other

21   agents and troopers wait down the road away from the residence

22   so that there wasn't a large conglomeration of troopers and

23   agents sitting in the front yard.

24   Q.   What happens then when she gets there?

25   A.   Agent Schirra and I spoke to her at the front of her

1    house.  We explained what had happened to John, Mr. Price.  And

2    explained that we would like to get consent, we asked her if it

3    would be okay if we looked around inside and outside the

4    residence.  She at that point in time said that she didn't have

5    a problem with that.  And Agent Schirra went inside the house,

6    I started walking around the outside.

7    Q.    Did you go into the house at that point in time at all?

8    A.    No, not at that point in time.

9    Q.    I just want to back up for one second.  Did anyone tell

10   her that she had to consent or force her or coerce her in any

11   way?

12   A.    No, absolutely not.  And that was part of the reason that

13   we had some troopers and other agents waiting down the road so

14   that it wouldn't look like there was an excessive amount of

15   people there.

16   Q.    Did she express any reluctance or hesitation prior to

17   giving her verbal consent?

18   A.    Not that I recall no, not at all.

19   Q.    Now, Agent Schirra then goes into the residence with Ms.

20   Fischer and you begin to look around outside?

21  A.   That's correct.

22  Q.   At some point in time do you then make contact again with

23  Agent Schirra?

24  A.   Yes, after a period of time I walked behind the house,

25  there was an outbuilding there.  Behind the outbuilding there

52

1  was a pile of what looked to be car seats and such things like

2  that.  I had additional information that there was allegedly a

3  stolen four-wheeler on the property.  I did find the stolen

4  four-wheeler underneath a bunch of garbage and car seats and

5  some covers, that was behind the house.  We had contacted a

6  marked state police unit to come out and also a towing service.

7  So in an effort to be able to have the four-wheeler towed from

8  there, we started to push it down around the corner towards the

9  road.  That was the side of the house that the basement

10  entrance was on.  And that's where I came back in contact with

11  Agent Schirra.

12  Q.   What happens with that contact, when you re-contact Agent

13  Schirra, what goes on?

14  A.   He came over and he mentioned to me that the door to the

15  basement was locked and Ms. Fischer was out there.  I asked

16  her, you know, if we could look in.

17        THE COURT:  Say that again, trooper, what do you ask

18  her?

19        THE WITNESS:  If we could look in the basement.

20        THE COURT:  Who asked and what was said

21  specifically?

22        THE WITNESS:  Well, your Honor --

23        THE COURT:  As best as you can recall?

24        THE WITNESS:  As best as I can recall, I just asked

25  her if we could look in the basement.


53


1  BY MR. TRABOLD:

2  Q.   You asked her that?

3  A.   I believe so.

4  Q.   Okay.  And what did she say?

5  A.   She said that it was locked and that she did not have a

6  key.  And if we could get in there without damaging the door,

7  we could look inside.

8  Q.   Did you then take steps to open the door without damaging

9  it?

10  A.    Yes, I did.

11  Q.    What did you do?

12  A.    The man door had a conventional lock set on it with a

13  large gap between the door and the jamb.  So I just slid a

14  knife in and just pulled the latch back.

15  Q.    And then you were able to get inside?

16  A.    That opened the door, yes.

17  Q.    Who went into the basement, garage area then?

18  A.    Initially I did and Agent Schirra.  I was only in there

19  for a short time and then I came out.  Then Agent Schirra came

20  out and said that he had found some -- items that were

21  chemicals, that would be used to manufacture methamphetamine.

22  Q.    And did you then have more contact with Ms. Fischer then?

23  A.    I don't recall that I did.  Because at the same time

24  there was several different things going on.  We were still

25  trying to get the four-wheeler removed from the property.


54


1  And -- when Agent Schirra came out, he said that there was a

2  danger because of the chemicals and the chemicals that were

3    together, so they had to clear the house.  We had to get the

4    area cordoned off.  Notifications needed to be made to the

5    Clandestine Lab Response Team.  And all these things were

6    happening all at once.

7    Q.    I want to back up and cover just a few other matters.

8    When you first got to the residence, yourself, Agent Schirra,

9    Agent Albeck, did any of the three of you have a written

10   consent form?

11   A.    No, we did not.

12   Q.    And when you are acting in your undercover capacity in

13   doing investigative type work, is it out of the ordinary that

14   you may not have a written consent form with you?

15   A.    It would be out of the ordinary if we did.

16   Q.    Why is that?

17   A.    When working in an undercover capacity, oftentimes, even

18   though it isn't planned, sometimes civilians or other people

19   may enter your car.  They may be targets or they may be somehow

20   related to targets, the best case is that you don't have police

21   type stuff lying around.

22   Q.    At the point in time when you first had contact with Ms.

23   Fischer on the property, did anyone that you were aware of have

24   a written consent form?

25  A.   No.


55


1  Q.   Subsequent, later on when you then go into the garage

2  briefly and come back out, it's determined that there is

3  methamphetamine material there, are there other officers on the

4  scene at that point in time then?

5  A.   Yes, absolutely.

6  Q.   Did you yourself during the course of searching the

7  outside area of the property have contact with other officers

8  or ask other officers to come on the scene?

9  A.   Yes.

10  Q.   Why did you ask other officers to come on the scene while

11  you were doing that search outside?

12  A.   Well, originally we had staged other officers away from

13  the residence.  So we had called those once we began to search

14  and find things, we called those officers in.  The other issue

15  was the four-wheeler.  A marked unit was called from, I believe

16  the Erie barracks, to come in and assist with the removal of

17  that and to accommodate the recovery of the stolen vehicle.

18        THE COURT:  The four-wheeler, is that an ATV?

19        THE WITNESS:  Yes.

20   BY MR. TRABOLD:

21   Q.    Just so the record is clear, this is the four-wheeler

22   that you believed to be stolen?

23   A.    Correct.  And, also, the auto theft trooper was notified

24   and he came out to the scene as well.

25   Q.    And just again so the record is clear, you did not take

56

1   part nor were you present for the search of the bedroom on Page

2   Road?

3   A.    No, I wasn't in the house except when we talked to the

4   kids.

5   Q.    You were outside looking at other things when that search

6   or activity occurred by Agent Schirra?

7   A.    Correct.

8   Q.    Now, is Ms. Fischer roughly a middle-aged woman, I guess

9   is a relative term, but have you determined that she was born

10   in 1966?

11   A.    Yes, I have.

12   Q.    And did Ms. Fischer appear when she first came on the

13   scene, when you first had contact with her, like she was under

14   the influence of any drugs or alcohol or anything like that?

15   A.   No, she didn't appear that way at all.  And, also, she

16   had just come from work.

17   Q.   Was there anything about her demeanor or anything that

18   she verbalized, anything at all that caused you to think that

19   she did not understand what you were talking to her about when

20   she first provided verbal consent?

21   A.   No, absolutely not.

22   Q.   And when you were in the garage area and you asked her if

23   you could look in the garage area and then you subsequently

24   jimmied the door, did she appear to be agitated or afraid or

25   again was there anything about her demeanor that caused you to

57

1   conclude that she was under duress at that point in time?

2   A.   No.

3   Q.   How would you characterize her demeanor at that point in

4   time?

5   A.   Well, to the best of my recollection she -- she was a

6   little nervous, which I don't think is anything outside of the

7  norm when you have a bunch of policemen around.  Outside of

8  that, I mean she was relatively normal, maybe a little bit

9  nervous.

10  Q.    When you asked her if it was okay if you went in as long

11  as you didn't damage the door, did she provide any hesitation

12  or say anything that caused you to conclude that she wasn't

13  one-hundred percent on you going into the garage?

14  A.    No, I wouldn't have gone in if she had.

15  Q.    And by virtue of preparing to testify in this case, one

16  of the things that you did was look into her prior criminal

17  activity?

18  A.    Correct.

19  Q.    And you were able to determine, at least by looking at

20  some criminal history reports, that it appears she's had

21  several involvements with the criminal justice system in

22  California?

23  A.    Yes, that's correct.

24        MR. TRABOLD:  One moment, your Honor.  Nothing

25  further, your Honor.

58

1    THE COURT:  All right.  Mr. Patton.

2                CROSS-EXAMINATION

3  BY MR. PATTON:

4  Q.    Trooper Wilson, you said that originally when you went

5  from the garage on Marchmont Avenue to the house on Page Road,

6  it was yourself, Agent Schirra and Agent Albeck?

7  A.    Yes, I believe that is correct, originally.

8  Q.    You guys were going there to try to get consent to search

9  the house, correct?

10  A.    Correct.

11  Q.    Because you knew you were going to be doing that, as you

12  were perhaps even driving to Page Road you were calling some

13  other troopers, either state police troopers or BNI people,

14  some more law enforcement personnel there to help you with that

15  if consent was obtained?

16  A.    Actually, my supervisor was doing that.  He had to

17  arrange for transport of Mr. Price and take care of some other

18  things.  The other troopers and agents were already on scene at

19  the garage, so they knew that we were going.  The idea was to

20  get there as soon as possible in case there was a lab there and

21  somebody got carried away and decided to start to try to

22  destroy things, sometimes that's when you have explosions --

23  Q.   Okay.  So while it was just the three of guys, being you,

24  Schirra and Albeck originally, before Ms. Fischer ever arrived

25  at the house, several other law enforcement officers arrived,

59

1  correct?

2  A.   Correct.

3  Q.   Including some uniformed Pennsylvania State Police

4  troopers, correct?

5  A.   No, they didn't arrive until later.

6  Q.   Well, which agents -- who went and picked Ms. Fischer up

7  when she ran out of gas?

8  A.   I believe Agent Tim Albeck and -- I think it might have

9  been Trooper Mark Weindorf, but I'm not certain of that.

10  Q.   On October 5th of 2004, when you were first arresting Mr.

11  Price at the Marchmont Avenue garage and at Page Road, nobody

12  was acting in an undercover capacity, correct?

13  A.   Correct.

14  Q.   You guys were announcing yourself as police officers,

15  arresting people and asking for permission to search, right?

16  A.   At the garage no, we just went to serve an arrest

17  warrant.

18  Q.   At the garage on Marchmont, you were going to execute an

19  arrest warrant, which means you're going to present yourself as

20  police officers, correct?

21  A.   Correct.

22  Q.   You have clothing on that indicated that you were a

23  police officer?

24  A.   Yes.

25  Q.   What did you have on?


60


1  A.   A bulletproof vest and a vest that also says state police

2  on it.

3  Q.   You weren't trying to hide the fact at that point in time

4  that you were a police officer, right?

5  A.   Correct.

6  Q.   And even before you guys went to the Marchmont Avenue

7  garage, you guys had information that Mr. Price was cooking

8  meth?

9  A.   Yes, at the garage.

10   Q.   At the garage and --

11   A.   Possibly -- I'm sorry, possibly at the garage.

12   Q.   Okay.  So you had information he's possibly searching at

13   the garage, excuse me, cooking meth at the garage on Marchmont

14   Avenue, correct?

15   A.   Correct.

16   Q.   And also you had information that he may be manufacturing

17   methamphetamine at his home on Page Road in Wattsburg?

18   A.   I think at the time we also had information that he may

19   have had storage units where he was also manufacturing meth.

20   Q.   Okay.  You knew when you went to arrest Mr. Price you

21   guys were going to, wanted to search that Marchmont Avenue

22   garage to try and see if there was a meth lab there, right?

23   A.   We just went, we went to Marchmont to serve the arrest

24   warrants.

25   Q.   You also wanted to try and search the Marchmont Avenue


61


1   garage as well to see if there was meth being cooked there,

2   right?

3   A.   Perhaps as an afterthought.  But once we knew that Mr.

4    Price was there for sure and we had the arrest warrants,

5    everything begins to move pretty fast.  Because you want to

6    make sure that he doesn't leave the area.  In fact, one of the

7    suspects that we went there to arrest did in fact leave the

8    area, came back while we were there and a chase ensued.  So

9    that's just the way these things happen.  Sometimes things go

10   very fast.

11   Q.    But before you guys even went to the Marchmont Avenue

12   garage, I assume you guys huddled up somewhere to discuss what

13   you were going to do, who was going to do what when you got to

14   the scene, correct?

15   A.    Correct, that would have happened in the parking lot of

16   the old Holiday Inn off of Interstate 90.

17   Q.    And when you guys were having your meeting, the

18   pre-arrest meeting, it was obvious amongst all of you that if

19   Mr. Price was there, he was going to be arrested, right?

20   A.    Correct.

21   Q.    And you also were going to try and search the premises of

22   the Marchmont garage, correct?

23          THE COURT:  Excuse me, a second.  Mr. Patton, I'm

24   going to let you go on with this, but the focus here, of

25   course, is the voluntariness of the consent at the house.

62

1        THE WITNESS:  Normally what happens in situations

2    like that pre-arrest meeting, we establish an ops plan.  The

3    heaviest focus on ops plans are generally safety.  If you tend

4    to start putting the cart before the horse and start talking

5    about search warrants and different things like that, often

6    times safety issues are overlooked.  So we generally don't

7    discuss those things in operational plans.  Oftentimes, as you

8    well know, that if in fact we did serve a search warrant in the

9    garage and observed during the arrest of Mr. Price items that

10   were used in the clandestine manufacture of methamphetamine, we

11   probably would have locked it down and secured a search warrant

12   at that point.

13   BY MR. PATTON:

14   Q.    By the time Ms. Fischer arrived at the house on Page

15   Road, how many other law enforcement agents had shown up?

16   A.    I can't give you an exact number, probably less than a

17   half dozen.  Most of those had come from the Marchmont Avenue.

18   Q.    And you guys knew that the specific reason you were going

19   there was to try to get consent to search, right?

20  A.    Correct.

21  Q.    For methamphetamine, correct?

22  A.    And a stolen four-wheeler.

23  Q.    So you were also there trying to get consent to search

24  for a stolen four-wheeler?

25  A.    Uh-huh.

63

1        THE COURT:  Yes or no?

2        THE WITNESS:  Yes.

3  BY MR. PATTON:

4  Q.    So when Ms. Fischer is brought to the house, you and

5  Agent Schirra speak with her?

6  A.    Correct.

7  Q.    You tell her that you want to look for -- you have

8  information that methamphetamine manufacturing has been going

9  on in the house?

10  A.    Possibly, that there was a clandestine lab.  We also

11  informed her of the dangers.

12  Q.    Did you tell her that you wanted to look to see if there

13  was a clandestine lab because it could be dangerous if there in

14  fact was one there?

15  A.    Correct.

16  Q.    Did you tell her anything else?

17  A.    I may have mentioned the four-wheeler is stolen property.

18  Q.    And she agrees to let you look for a meth lab and a

19  stolen four-wheeler?

20  A.    As I recall, she said it would be okay if you looked, it

21  would be okay if you guys looked around.  And I clarified that

22  with her, as I remember, inside and out, she said yes.

23  Q.    Did you tell her that you were going to be looking for

24  the four-wheeler or did you have permission to search for the

25  meth manufacturing items?


                                    64


1  A.    I really don't recall.  I think I brought up stolen

2  property.

3  Q.    So you started looking around outside the residence,

4  correct?

5  A.    Correct.

6  Q.    While Agent Schirra went inside the residence?

7  A.    That's correct.

8   Q.   And as part of your search, you were searching around a

9   detached outbuilding, is that right?

10  A.   Yes.

11  Q.   And in back of that outbuilding, I think maybe between a

12  couple vehicles, you saw a pile of rugs and car seats and

13  things of that nature?

14  A.   That's correct.

15  Q.   Is it accurate to say you thought the ATV might be

16  underneath there?

17  A.   Well, if you picked up one of the rugs, you could see it

18  was an ATV.

19  Q.   So you thought hey, this is where the ATV may be, I want

20  to look under here?

21  A.   Well, I knew something was stored under there before I

22  picked the rugs up and I wasn't sure if it was meth

23  manufacturing equipment or not.  That's common with people that

24  manufacture meth.

25  Q.   After you find the four-wheeler, I believe you said you


                                    65


1   guys started pulling it out and pushing it around down towards

2  the front of the house, right?

3  A.   Correct.

4  Q.   As you're going around the side of the house, you just

5  happen to be going around the side of the house where the

6  entrance to the basement of the house is located, right?

7  A.   I was on that side of the house.  There's a large yard

8  but yes, I was on that side of the house, I wasn't next to the

9  house.

10  Q.   And when you came around, you saw Agent Schirra and Ms.

11  Fischer by the doorway to the garage, right?

12  A.   Yes, I believe so.

13  Q.   And at that time Agent Schirra was trying to get into the

14  basement, was trying to gain entry into the basement, right?

15  A.   No, I think he was talking to her.

16  Q.   Well, you wrote a report regarding your activities at the

17  house on Page Road?

18  A.   Correct.  You mean physically trying to get in or trying

19  to talk to her about getting in?

20  Q.   Well -- do you see on your screen?

21  A.   Uh-huh.

22  Q.   Okay.  See where my pen is -- right they're it says "the

23  Auto Theft Unit was notified and then the veh", short for

24  vehicle, "was towed to PSP station at Erie?"

25  A.    Correct.


66


1  Q.    The report then says "at this time Schirra was attempting

2  to gain entry to the basement of the residence.  I assisted him

3  at this point in a brief search of the basement which revealed

4  several containers of chemicals?"

5  A.    Correct.

6  Q.    When you came around the side of the house, Schirra was

7  physically trying to get into the basement, correct?

8  A.    I don't believe so, I think the door was locked.

9  Q.    Well, what did your wording mean "attempting to gain

10  entry to the basement of the residence?"

11  A.    That he was talking to Ms. Fischer about getting into the

12  basement, but the door was locked.

13  Q.    So your way of conveying in your report the fact that

14  Agent Schirra was talking to Deborah Fischer when you came

15  around the house is to write that Schirra was attempting to

16  gain entry into the basement of the residence?

17  A.   Yeah, that's correct.

18  Q.   Now, as you point out, the door was locked, correct?

19  A.   Correct.

20  Q.   And Ms. Fischer told you that she did not have a key?

21  A.   Correct.

22  Q.   And, generally, if a door's locked and someone doesn't

23  have a key to the door, that would be a good indication that

24  they don't have access to that area, correct?

25  A.   If I remember right, that's where their washer and dryer

67

1  was and she did have access to it.

2  Q.   Well, she didn't have a key to get access when it was

3  locked, did she?

4  A.   She did not have a key, that's what she said.

5  Q.   And when you guys asked her if you could go into the

6  basement, she told you that if it was not locked you could go

7  in, correct?

8  A.   She said if we didn't damage the door that we could go

9  in.  If we could get it open.

10  Q.   She said if you didn't have to break in you could go in?

11  A.   Right, or words to that effect.

12  Q.   Okay.  And so you took her -- words to the effect that if

13  you don't have to break in, you can go in?

14  A.   Yeah, if you don't have to damage the door.

15        THE COURT:  Wait a minute here.  There's a big

16  difference between if you don't have to break in or if you

17  don't have to damage the door or words to that effect.  I'm

18  interested in knowing specifically what you recall her saying

19  to you?

20        THE WITNESS:  I recall her saying that if you don't

21  break the door, you can go in.

22  BY MR. PATTON:

23  Q.   So the door is locked, she doesn't have a key, tells you

24  that she doesn't have a key, but tells you, well, if you can

25  somehow get in a locked door without damaging the door, go

68

1  ahead and go in?

2  A.   That's correct.

3  Q.   You physically went into the basement?

4  A.   Yes.

5   Q.    When you physically went in, you did not see anything

6   indicative of methamphetamine manufacture?

7   A.    No, I was only in the first portion and then I walked

8   out.

9   Q.    When you say the first portion, what do you mean?

10  A.    Well, I don't know that it's broken up into portions, but

11  I was just a few feet inside, walked, you know, a half a dozen

12  steps in and then I walked back out.

13  Q.    In your walking in a half dozen steps into the basement,

14  I assume you were looking around the basement area?

15  A.    Just to make sure that it was secure, that it was safe.

16  So that somebody wasn't hiding in there with a gun.

17  Q.    You went into the basement far enough and looked around

18  sufficiently to satisfy yourself that there wasn't someone

19  hiding in there with a gun?

20  A.    Correct.

21  Q.    While you were doing that, you didn't observe anything

22  that looked to you like it was being used to manufacture

23  methamphetamine?

24  A.    No, I didn't.

25  Q.    After you and Agent Schirra had been in the basement and

69

1  out of the basement, you guys then asked Ms. Fischer to sign a

2  written consent to search the basement, correct?

3  A.    Agent Schirra did, yes.

4  Q.    Well, were you there when that occurred?

5  A.    I think at that point in time I was between there and

6  still dealing with the ATV, getting it loaded up on a truck and

7  getting it out and securing the premises for the Clandestine

8  Lab team.

9  Q.    So you weren't involved in any of the detailed discussion

10  between Mr. Schirra or Agent Schirra and Ms. Fischer with

11  regards to the written consent?

12  A.    No.

13        MR. PATTON:  Those are my questions, your Honor.

14        THE COURT:  All right, anything further of this

15  witness?

16        MR. TRABOLD:  Just briefly.

17            REDIRECT EXAMINATION

18  BY MR. TRABOLD:

19  Q.    How long time wise would you say you were in the

20  basement, roughly?

21  A.   Less than five minutes.

22  Q.   And I thought you indicated on direct testimony that many

23  of the officers had, for lack of a better term, were at a

24  staging area away from the residence, not on the Price property

25  on Page Road?

70

1  A.   That's correct.

2  Q.   Just so the record is clear, when you had contact with

3  Ms. Fischer, were those officers still off scene, off the

4  property or away from the property so that everyone wouldn't

5  swarm at the same time?

6  A.   Yes, they were, except for the ones that had to go pick

7  her up and transport her.

8  Q.   So it still would have been the same three or four

9  officers that were actually on the property when she provided

10  the verbal consent initially?

11  A.   Yes, that's correct.

12  Q.   So all of those other officers that you talked about,

13  were they or were they not on the property at that point in

14  time when she provided verbal consent?

15  A.   No, they weren't.  And there's a reason for that, simply

16  because you don't want --

17       THE COURT:  Sir, keep your voice up a little bit,

18  please.

19       THE WITNESS:  The reason for that is so that there

20  isn't, the people are not overwhelmed with law enforcement's

21  presence whenever they give or do not give consent.  So it's

22  not -- so that they're more relaxed and they don't feel coerced

23  at all.

24  BY MR. TRABOLD:

25  Q.   Where would those officers have been, just so we can be


                              71


1  as specific as possible, if you recall?

2  A.   They were waiting down the road.

3       MR. TRABOLD:  Okay.  Nothing further, your Honor.

4       THE COURT:  All right, thank you, trooper.  Do you

5  have any other witnesses, Mr. Trabold?

6       MR. TRABOLD:  No, your Honor.

7       THE COURT:  Mr. Patton, are you going to have any

8  witnesses?

file:///A|/PRICESUP.TXT

9          MR. PATTON:  No, your Honor.

10         THE COURT:  All right.  Let me hear what you have to

11   say by way of summary?

12         MR. PATTON:  Your Honor, I do have some argument to

13   make, but I think based on the way some of the evidence came in

14   today, with the revocation of consent, that those issues

15   weren't --

16         THE COURT:  They weren't addressed in the briefs?

17         MR. PATTON:  Exactly.  Because when I wrote the

18   brief, what I had was the affidavit in support of the search

19   warrant.  Which the agents aren't required to put every detail

20   of everything that happens.  I would request, I think it's

21   appropriate --

22         THE COURT:  You want to get the transcript and do a

23   brief?

24         MR. PATTON:  Yes.

25         THE COURT:  A post-hearing brief?


72


1          MR. PATTON:  Correct.  Because otherwise we're going

2    to be talking about some stuff -- some issues that weren't

3    raised in the brief.  And, also, this has to do with the sodium

4    hypophosphite that was found in the garage on Marchmont Avenue.

5    Until I got Agent Schirra's report today, I didn't have any

6    indication that there was stuff found during a search of that

7    garage on Marchmont that could be used at trial.  And Agent

8    Schirra's testimony today was that he believed the coat, where

9    the sodium hypophosphite was found in, was Mr. Price's coat.

10   But I believe that that was an illegal search of that coat, so

11   I'd like to address that issue as well.

12        THE COURT:  So you want to file, essentially, an

13   amended motion to suppress -- amended brief, a brief in support

14   of a motion that is somewhat broader in scope than your

15   original one?

16        MR. PATTON:  Yes.

17        THE COURT:  All right, I'm going to let you do that.

18   But that being said, just by way of a brief preview as to what

19   I'm going to see on the written page, why don't you tell me,

20   now that you heard the testimony, why you think this ought to

21   be suppressed?

22        MR. PATTON:  With regard to the sodium

23   hypophosphite.  They go to the Marchmont Avenue garage with an

24  arrest warrant, no search warrant.  Mr. Price is arrested,

25  handcuffed, nobody else is present in the garage.  Mr. Price is

73

1  taken out of the garage.  It's only at that point that they're

2  searching pockets of coats that are in the garage.  They have

3  no authority to be searching in the garage.  They have a

4  limited right, for officer safety, to make sure there is no one

5  else in the garage while they're effectuating the arrest.

6        THE COURT:  The first addition, if you will, to your

7  motion, is going to challenge the scope of the physical search

8  of the garage?

9        MR. PATTON:  Correct.

10        THE COURT:  As being beyond what is necessary to

11  effectuate the arrest?

12        MR. PATTON:  Correct.

13        THE COURT:  All right, then what?

14        MR. PATTON:  At the Page Road residence, if you

15  accept that Ms. Fischer originally gave consent, all she's told

16  at that time is we want to look around because it may be

17  dangerous for you and your kids.  She's not told you have the

18  right not to consent.  She's not told if you do consent and we

19  search, anything we find can be used against you.  It's

20  portrayed to her, according to Agent Schirra's testimony and

21  Trooper Wilson's, is basically this is for your safety, this is

22  to help you out.  And Ms. Fischer allegedly then gives consent

23  to search the house and outside the residence.

24          Once they get into the bedroom and Schirra finds the

25  sodium hypophosphite, the first time he gets asked about this

                                    74

1  by Mr. Trabold, and you said your notes had the same thing, his

2  response is, his testimony was after the sodium hypophosphite

3  is found, Ms. Fischer says stop searching.  Because now Ms.

4  Fischer knows she's potentially in trouble.  And for that

5  matter Mr. Price could be in trouble because there's stuff

6  there that is linked to the manufacture of methamphetamine.

7  That is a classic revocation of consent to search.  And any

8  verbal consent to search or written consent to search for that

9  matter can be withdrawn at any point in time.  Ms. Fischer

10  withdrew her consent.

11          THE COURT:  So the factual issue there is going to

12    be the scope of the withdrawal of the consent?

13          MR. PATTON:  Correct.  And then after she withdraws

14    the consent, according to Agent Schirra, it's, well, we really

15    want to look in the basement, that's where we think the meth

16    lab is, why don't you show us where that is.  Come on, show us

17    where the meth lab is, we want to get in there and look.  Any

18    consent that comes after that is simply going to be a giving in

19    to police authority.  Because once she's already revoked her

20    consent, the police are still saying well, come on, let us

21    search part of the house where we really think the meth lab is.

22    Even if she did consent after that, the consent wouldn't be

23    valid because it would be coerced.

24          THE COURT:  Let me ask you this, then I'll let you

25    finish up.  I'm not holding you to the proposition that this is


75


1    going to be the entire argument I see in the brief.  For the

2    sake of argument, assume only for purposes of my question that

3    you're right on the revocation and that everything that

4    happened thereafter is tainted, he did see two pipes in an open

5    condition in plain view, would the two pipes independently have

6    supported the search of the residence?

7        MR. PATTON:  It would provide probable cause to

8    search the residence if you had a search warrant.  But when you

9    want to search someone's home, even if you have probable cause,

10   you cannot search unless you have consent or a warrant.

11       THE COURT:  Let me roll the tape back and ask it

12   this way.  Assuming only for purposes of my question if the

13   consent to get in was voluntary, and that what was then seen

14   was in plain view and fair game, the two pipes, even if

15   everything else that they found by virtue of the revocation of

16   the consent was suppressed, would the affidavit, if that

17   information was taken out of it, still be adequate -- do you

18   understand my question, only on the basis of the two pipes?

19       MR. PATTON:  No, the possession of two pipes does

20   not give probable cause to search a house for manufacturing

21   methamphetamine.

22       THE COURT:  All right.  What else do you want to

23   tell me real quick, anything?

24       MR. PATTON:  That if the door to the residence was

25   locked and she doesn't have a key to get she in, she doesn't

76

1  have access, she doesn't have authority to give consent over

2  that portion of the residence.

3        THE COURT:  Because it's not her domain?

4        MR. PATTON:  Correct.   What Agent Schirra testified

5  today was, you know, to the extent she said she had access, she

6  said Johnny would let me in.  And so even if the washer and

7  dryer are down there and even if Mr. Price would let her down

8  there to use the washer and dryer, that doesn't mean she had

9  authority to allow people to go in there when he hasn't done

10  so.

11        THE COURT:  All right.  Thank you.  Real quickly

12  there, Mr. Trabold.

13        MR. TRABOLD:  Judge, there's no evidence that the

14  consent, the second subsequent consent was coerced.  And Ms.

15  Fischer is right outside and could have testified to these

16  issues had they decided to call her.  So there is no evidence,

17  though, that anything was coerced.  There is no evidence in the

18  record that Ms. Fischer's subsequent consent was coerced.  In

19  fact, the evidence is exactly the opposite.

20        THE COURT:  When you say subsequently, we've got a

21  lot of consents flying here, which one are we talking about?

22          MR. TRABOLD:  I mean the consent that she provides,

23   hey, you can go into the basement as long as you don't damage

24   the door or have to break the door.  There is no evidence that

25   that's a coerced consent.


                                    77


1          THE COURT:  Did she have the authority to do that?

2          MR. TRABOLD:  Your Honor, this is her house, the

3   garage is attached to the house.  She indicates to law

4   enforcement officers that when she's there, I do laundry in

5   there, our washer and dryer are there and we store Christmas

6   decorations down there.  Of course, she had consent to

7   authorize a search of that area.  I mean, obviously she has

8   egress and ingress to there on a repeated basis if that's where

9   she does the laundry.  So the fact that she indicated that she

10  doesn't have the key at that point in time doesn't mean she

11  didn't have the authority to consent.

12          THE COURT:  Just briefly, then, Mr. Patton says that

13  everything -- he says initially that I should find the initial

14  consent involuntary to get into the house.  But, secondarily,

15  even if it was voluntary, I should find there was a revocation

16  of consent to further search when she made whatever statement I

17  find she made in the bedroom.  What is the government's

18  position on that?

19      MR. TRABOLD:  Well, I don't think that that's a

20  revocation.  What you heard from the officer when he was

21  offered the opportunity to clarify what it is that was said,

22  was that she told him stop searching in the dresser drawers, I

23  don't want you to look in the drawers anymore.  And that there

24  was a discussion about the basement and then she led the

25  officer to the basement.  Which is not, I would submit to you,


78


1  indicative of somebody revoking their consent to search the

2  entirety of the property or even the entirety of the house.

3      THE COURT:  So you would view it as a partial

4  revocation of the scope, is that what you're saying?

5      MR. TRABOLD:  Yes.  What's critical about that is

6  the officer was asked to clarify what it is that occurred and

7  he clarified it and all that was limited was the search of the

8  dresser drawers.

9      THE COURT:  This may be neither here nor there but

10  it just occurred to me.  The evidence suggests that the law

11  enforcement officials already had significant information from

12  CI sources and others that he was manufacturing methamphetamine

13  at his residence.  And, as a matter of fact, of course, they

14  already knew they were going to arrest him for a crime that he

15  had committed a year or so before in selling methamphetamine.

16  Why didn't they just go get a warrant to search, wasn't that

17  enough right there to go get a warrant and search his house for

18  methamphetamine production?

19          MR. TRABOLD:  Well, if we're speaking theoretically,

20  yes, but I don't think that's of any moment to your

21  consideration.

22          THE COURT:  I didn't say it was or it wasn't, I was

23  just asking you a question.

24          MR. TRABOLD:  I would say at that point in time,

25  yes, they probably had enough, not probably, they definitely


79


1  had enough to go get a search warrant as part of the arrest of

2  Mr. Price.  However, I think you got a little bit of the sense

3  of why that may not be done strategically in the sense that if

4    you can go to the residence and get consent, you can more

5    quickly remove items that are possibly of a hazardous nature

6    from a household where children are living so that you don't

7    have, you can essentially avert a danger more quickly if you're

8    able to get consent than if you have to take time getting a

9    warrant and drafting a warrant.  This was evening hours,

10   obviously, the magistrate or a district justice would have had

11   to have been located outside of normal business hours.  If

12   consent is obtained, it is much more quick and the idea here is

13   get these items away from possibly causing harm to children as

14   quickly as possible.

15          I just want to, the final point I want to bring up,

16   your Honor, you have no evidence in this case presented by the

17   defense that Ms. Fischer did not consent to a search of that

18   garage.  Both officers indicated clearly yes, you can go in

19   there as long as the door is not damaged.  The door was not

20   damaged and that they were allowed to go in.

21          THE COURT:  One other question because I anticipate

22   it will be in his brief.  If I were to find that the officers

23   said that we want to search to determine if there's

24   methamphetamine production or chemicals in the household for

25   the safety of your children, I presume Mr. Patton's point is


80


1   implicitly made here at least, if not explicitly, that that was

2   a misrepresentation of intention.  If I were to find that, does

3   that enter into my calculus on the voluntariness of consent?

4        MR. TRABOLD:  I don't think it does.  Because I

5   don't think the law requires the police officers to lay out

6   every intention they have in searching a place.  There is

7   nothing in federal law that requires the officers --

8        THE COURT:  As long as it was a intention?

9        MR. TRABOLD:  Yes, there's nothing that requires

10   them to say we want you to give consent because we want to

11   remove the danger to your kids and we want to prosecute you and

12   your husband should we find anything.  It should be relatively

13   obvious that if items of incriminating nature are found in your

14   residence, you're exposing yourself to the possibility of

15   future criminal involvement.

16        The only other issue I just want to briefly touch

17   on, it's the government's position that this warrant, even if

18   you remove anything that comes from what they observed in that

19  basement, clearly provides probable cause to search that house

20  because the warrant not only includes that the two pipes used

21  to ingest methamphetamine were found inside the warrant, but

22  that in 2002 Agent Schirra purchased methamphetamine from Mr.

23  Price.  So it's the government's position that even if you were

24  to remove all of the items that were discovered in the basement

25  as part of the consent --


81


1       THE COURT:  Weren't there items discovered in the

2  drawer in the bedroom?

3       MR. TRABOLD:  I mean if you kept those items in the

4  warrant --

5       THE COURT:  You mean the pipes and the chemicals?

6       MR. TRABOLD:  The pipes, I'm not sure if the warrant

7  mentions the chemicals or not.  My point is if you keep in the

8  warrant just the information that pipes were found that could

9  be used to ingest controlled substances, and the fact that Mr.

10  Price had sold --

11       THE COURT:   So it's another Franks issue sort of?
                      _____

12       MR. TRABOLD:  In a sense.

13          THE COURT:  Excise the bad, is there enough there?

14          MR. TRABOLD:  True.

15          THE COURT:  All right, thank you.  Let's talk about

16   timing.  You want the transcript before you do this?

17          MR. PATTON:  Yes, sir.  If your Honor could give me

18   a time period from when I receive the transcript.  How about

19   two weeks from the time I get the transcript?

20          THE COURT:  Yes.

21          MR. TRABOLD:  Whatever the relevant time period is,

22   your Honor, I understand.

23          THE COURT:  Two weeks for a response.  I just want

24   to make sure on this, my Deputy Clerk here is keeping track of

25   speedy trial issues.


                              82


1           MR. PATTON:  I don't think we can even be remotely

2    close because I continued this to file pretrial motions, until

3    the time the actual motion was filed --

4           THE COURT:  And this will start it again, won't it,

5    this renewed motion?

6           MR. PATTON:  This will continue to toll the time

7   because you now have the motion under advisement.

8          THE COURT:  All right.  On a somewhat unrelated

9   note, but it still involves this case, just looking down the

10  road a little bit -- Nicole tells me, this is to Mr. Patton,

11  you're concerned about getting backed up with two cases in the

12  May term?

13         MR. PATTON:  There's a very good chance this case

14  will go to trial.  Now, of course, if it's suppressed, it

15  doesn't or if it's not suppressed, things change.  But the

16  other thing is, from speaking with your courtroom deputy, if

17  the Eberle case is to go to trial, that likely is going to be

18  at the beginning of the May trial calendar.

19         THE COURT:  Here's the deal, if for some reason --

20  if this is any comfort to you, if for some reason both of these

21  cases end up on that term, one will go at the beginning and we

22  will put the other at the other end of the trial term.

23         MR. PATTON:  That's fine.

24         THE COURT:  So you don't have to go back to back.

25  All right, thank you, counsel.

83

1          (Whereupon, at 11:40 a.m., the proceedings were

2   concluded.)

3

4

5                    - - -

6

7

8

9              C E R T I F I C A T E
               _ _ _ _ _ _ _ _ _ _

10

11

12

13     I, Ronald J. Bench, certify that the foregoing is a

14   correct transcript from the record of proceedings in the

15   above-entitled matter.

16

17

18

19   _____

20   Ronald J. Bench

21

22

23

24

25