IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 04-50 Erie |
| | ) | |
| JOHN JOSEPH PRICE, JR. | ) | |

**DEFENDANT JOHN JOSEPH PRICE, JR.'S POST-HEARING
BRIEF IN SUPPORT OF MOTION TO SUPPRESS
WITH CITATION TO AUTHORITIES**

AND NOW, comes the defendant, John Joseph Price, Jr., by his attorney, Thomas W. Patton,

Assistant Federal Public Defender, and respectfully files this Post-Hearing Brief in Support of His

Motion to Suppress. In support thereof Counsel states:

**The Search of the Coat on Marchmont Road**

Agents from the Attorney General's Office and the Pennsylvania State Police arrested Mr.

Price on an outstanding warrant at his auto-garage on Marchmont Road on October 5, 2004. (T. 24-

25) Agents located Mr. Price in an office area in the back of the garage, placed him on the floor,

handcuffed him, and removed him from the garage. (T.25) No one else was present in the garage.

After Mr. Price was out of the garage, agents searched a coat found in the garage. Inside one of the

coat's pockets, not in plain view, agents found a bag containing sodium hypophosphite. (T.26)

The sodium hypophosphite found in the coat pocket must be suppressed. The agents did not

have a search warrant authorizing a search of the garage nor is the search justified as being incident

to Mr. Price's arrest. Police may search a man incident to his arrest to ensure that he is not armed.

Chimel v. California, 395 U.S. 752, 762-63, 89 S.Ct. 2034 (1969). "[T]he scope of such a search

must be 'strictly tied to and justified by the circumstances which rendered its initiation permissible.'"

United States v. Myers, 308 F.3d 251, 266 (3rd Cir. 2002) (citing Chimel supra, at 762). In this case,

Mr. Price had already been removed from the garage, in handcuffs, and was in the custody of multiple police officers **before** the search of the coat occurred. Under these circumstances there was no basis to believe Mr. Price might gain access to any weapon or evidence contained in the coat pocket. Accordingly, the search cannot be justified as incident to his arrest. The Third Circuit has held that when there is an objective basis to conclude that the arresting office had no reason to fear either the arrestee or the environment in which the arrest unfolded there can be no search incident to arrest. Myers, 308 F.3d at 273. In that case, the Third Circuit found that a search of a duffel bag lying three feet from the defendant could not be justified as a search incident to arrest when the defendant was lying face down on the floor with his hands handcuffed behind his back guarded by two police officers and had already been frisked for weapons. Id. In United States v. Lyons, 706 F.2d 321, 330-31 (D.C. Cir. 1983), the court held that a search of the defendant's closet in his motel room could not be justified as a search incident to arrest when the defendant was sitting handcuffed in a chair on the other side of the room and there were six police officers in the room.

In this case, the search of the coat was not incident to Mr. Price's arrest. The government presented no evidence that the coat was located near Mr. Price when he was arrested, and the coat was searched after Mr. Price had been placed on the floor, handcuffed, taken completely out of the garage, in the custody of numerous officers. The sodium hypophosphite found in the coat must be suppressed.[1]

## The Government Did Not Establish That Ms. Fischer
## Voluntarily Consented to the Search of the House

---

[1]This issue was not raised in Mr. Price's original motion to suppress because prior to receiving Agent Schirra's report on the day of the suppression hearing Mr. Price's counsel had no knowledge that anything of evidentiary value had been found at the garage on Marchmont Road.

Where the validity of a search rests on consent, the government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given.   Florida v. Royer, 460 U.S. 491, 497 (1983) (plurality); Schneckloth v. Bustamonte, 412 U.S. 218, 248-49 (1973).   The determination of whether or not consent to search was freely and voluntarily given is one of fact that must be made based on the totality of the circumstances.   Schneckloth, 412 U.S. at 227.   Courts consider the following factors in making the voluntariness determination: the age of the accused, his education, his intelligence, whether he was advised of his constitutional rights, and whether the questioning was repeated and prolonged.   United States v. Kim, 27 F.3d 947, 955 (3rd Cir. 1994).

There is no "ready definition of the meaning of 'voluntariness.'"   Schneckloth, 412 U.S. at 224.   The term reflects an accommodation between the need for effective enforcement of the criminal law and "society's deeply felt belief that the criminal law cannot be used as an instrument of unfairness."   Id. at 224-25.   To this end, courts have held that deception or trickery on the part of the police in gaining consent to search is a factor to be considered in determining the voluntariness of the consent.   United States v. Carter, 884 F.2d 368, 375 (8th Cir. 1989) (collecting cases).   In Carter, a mail carrier suspected of stealing mail from a bank was interrogated by postal inspectors in the office of the bank president.   Id. at 369.   About fifty-five minutes into the interrogation, the inspectors told Carter that they were investigating the disappearance of Canadian money and asked if they could look into his wallet.   Carter agreed, and the inspectors found marked money and a check that had been placed in the bank's mail tray by the inspectors.   The inspectors confronted Carter with this information and he confessed to taking the items.   The district court suppressed the money and check, finding that Carter's consent to search his wallet was involuntary because it was "given in a

coercive atmosphere in which no <u>Miranda</u> warnings were given, misrepresentations were made by the postal inspectors to induce the defendant's consent, and the defendant was not informed that he was not required to consent to the search." <u>Id</u>. at 374. The Eight Circuit affirmed, finding that the inspectors' deception was one factor to be considered in determining the voluntariness of consent.

In this case, both Schirra and Wilson testified that they told Ms. Fischer that the purpose of the search was to protect her and her children's safety. (T.33, 63) Ms. Fischer was not told that she did not have to consent to the search or that anything found during the search could be used against either herself or Mr. Price. Given the deceptive statements of Schirra and Wilson that the purpose of the search was simply to protect Ms. Fischer and her children, the absence of these warnings is not surprising. If Schirra or Wilson would have told Ms. Fischer that anything found during the search would be used to prosecute her or Mr. Price, it would have made clear that the purpose of the search wasn't to protect Ms. Fischer and her children but rather to discover evidence to support charges of manufacturing methamphetamine. The fact that when the sodium hypophosphite was found and Schirra made clear that it was going to be used to get Ms. Fischer into trouble, she immediately told Schirra to stop searching the house (T.38) and that when asked to sign a written consent to search she refused shows that if Schirra and Wilson had not been deceptive about the purpose of the search when obtaining the initial consent, Ms. Fischer would not have consented.

Schirra's and Wilson's failure to immediately remove the children from the house and search the house for dangerous chemicals also reveals the deceit behind the statement that the purpose of the search was to protect Ms. Fischer and the children. If Schirra's and Wilson's concern was the safety of the children while in the house, why did they allow the children to remain in the house for at least a half hour while they waited for Ms. Fischer to arrive? If Schirra and Wilson had probable

4

cause to believe that the house contained a methamphetamine lab, which the prosecutor claimed at the hearing they did (T. 78-79) and that the lab posed an immediate safety hazard, they would have, and legally could have due to exigent circumstances, immediately removed the children from the house and searched the house to eliminate the danger.

It is true that Ms. Fischer is a middle-aged woman and that she agreed to allow the search shortly after being asked. The deceit employed by Schirra and Wilson, however, prevent these facts from weighing in favor of finding her consent voluntary. This isn't a case involving the police using physically coercive means to wear down a defendant in order to obtain consent. It is, rather, a case in which the police untruthfully conveyed the impression that the search had nothing to do with investigating a crime. As Schirra admitted, he told Ms. Fischer that the purpose of the search was to protect Ms. Fischer and the children. (T. 33) The Supreme Court made clear in <u>Schneckloth</u> that "the criminal law cannot be used as an instrument of unfairness." <u>Id</u>. at 224-25. That is what this Court would allow to happen if it were to find Ms. Fischer's consent voluntary.

On a final note, the prosecutor made a point at the hearing of the fact that Ms. Fischer did not testify, implying that that fact somehow established that consent had been voluntarily given. That is not true. When the government seeks to justify the warrantless search of a home on the claim that the search was authorized by consent, **the government** bears the burden of proving that consent was actually given and that the consent was voluntary.

### Any Voluntary Consent by Ms. Fischer Was Revoked

If the Court finds that Ms. Fischer did voluntarily consent to a search of the house, that consent was revoked after Schirra found incriminating evidence in Ms. Fischer's bedroom. While searching Ms. Fischer's and Mr. Price's bedroom Schirra found two pipes he believed had been used

5

to smoke methamphetamine in the drawer of a nightstand.  (T.11)  Schirra continued to search the bedroom, finding a bag of what he believed to be sodium hypophosphite, a precursor chemical for manufacturing methamphetamine, in a drawer in the bedroom.  (T. 12) Schirra gave the following testimony as to what happened after he found the bag of sodium hypophosphite:

Q. "After you find that, what occurs between you and Ms. Fischer?"

A.  "At that point - - I believe she asked me to stop searching the house part.  Because we found that stuff and she thought she was going to get in trouble."

(T.13) The Court is not likely to come across a more clear revocation of consent.

A person consenting to a search of their home "may limit the scope of that search, and hence at any moment may retract his consent."  Painter v. Robertson, 185 F.3d 557, 567 (6th Cir. 1999); United States v. Mitchell, 82 F.3d 146, 151 (7th Cir. 1996).  When consent to search is withdrawn, the search should terminate instantly and law enforcement officers should promptly depart the premises.  Id.   When Ms. Fischer told Schirra to stop searching the house he was required to stop searching the house which, of course, included the basement.

Of course, after it became apparent that there was going to be trouble for Schirra if Ms. Fischer withdrew her consent to search, he dramatically changed his testimony on that topic.  After having testified clearly and without hesitation that after the sodium hypophosphite was found in the dresser drawer Ms. Fischer told him to "stop searching the house part" Schirra changed his testimony stating that Ms. Fischer told him to stop searching the drawers of the bedroom.  (T. 21) But on cross-examination Schirra admitted that Ms. Fischer had withdrew her consent for more than just the dresser drawers.

When questioned about what happened after the sodium hypophosphite was found in the

bedroom the following exchange took place:

Q.    This is after she's told you I don't want you to look around for anything that's going to get me into more trouble than I'm already in with the sodium hypophosphite, right?

A.    Correct, that was upstairs.

Q.    But after you find the sodium hypophosphite, she realizes she's in trouble and you tell her that she's in trouble, she told you to stop looking, correct?

A.    Correct, upstairs.

Q.    She didn't want you looking in the house, correct?

A.    Upstairs, yes.

(T.41)  Clearly this testimony reveals that Schirra's initial testimony, that Ms. Fischer told him to stop searching the house part, was accurate.  Indeed, Schirra believed his ability to search the whole house was limited based on Ms. Fischer's revocation of her verbal consent.  (T.45)

        In the end, it is clear that Ms. Fischer revoked any consent she had given to search the house after the sodium hypophosphite was found in the bedroom.  The basement is obviously part of the house (T.42) so the revocation of consent to search the house included the revocation of any consent to search the basement.  But, Schirra didn't accept this withdrawal of consent and insisted on trying to get consent to search the basement.  (T.22) After the revocation of consent to search the house Schirra questioned Ms. Fischer about access to the basement and had her take him outside to show him how the basement could be accessed.  (T.40) Even if the Court finds that Ms. Fischer consented to the search of the basement, that consent was not valid as it was merely a submission to police authority.  The government's burden of proving voluntary consent  "is not satisfied by showing a mere submission to a claim of lawful authority."  Florida v. Royer, 460 U.S. 491, 509 (1983).  Ms. Fischer had already revoked any consent she had given to search the house but Schirra refused to

accept that revocation, continued to search the house and asked Ms. Fischer to let him search the house.  The message was clear, the revocation of consent was meaningless and Schirra was going to continue searching regardless of what Ms. Fischer did or said.

Any voluntary consent Ms. Fischer may have given to search her and Mr. Price's home was revoked after Schirra found the sodium hypophosphite in the dresser drawer.  Any evidence found after the revocation of consent must be suppressed.

### Ms. Fischer Did Not Have Actual Or Apparent Authority To Consent

### To A Search Of The Basement

If the government attempts to rely upon the consent of a third party to justify a consent search, the government has the burden of proving that the consenting party has "common authority" over the premises to be searched.  Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797 (1990).  Common authority rests upon "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."  United States v. Matlock, 415 U.S. 164, 171 n.7, 94 S.Ct. 988, 993 n.7 (1974).

"Certainly the notion that persons sharing premises generally might nonetheless maintain certain mutually exclusive zones of privacy is a sound one, and is totally consistent with the underlying rationale of Matlock."  4 W. LaFave, Search and Seizure § 8.3(f), at 167 (4th ed. 2004).  As the Supreme Court explained most recently in Georgia v. Randolph, 2006 WL 707380, *6 (2006), "Matlock relied on what was usual and placed no burden on the police to eliminate the possibility of atypical arrangements, **in the absence of reason to doubt that the regular scheme was in**

place." (emphasis added). It would undoubtedly be reasonable for police officers to expect that a wife or paramour would normally have authority to consent to a search of most parts of the home she shares with her husband or boyfriend. However, once the police have reason to doubt that these expectations are correct, they must respect the living arrangements between the couple, and one cannot consent to the search of an area over which the other maintains exclusive control. <u>United States v. Block</u>, 590 F.2d 535 (4th Cir. 1978) (mother had authority to consent to search of son's room but not his locked footlocker for which the mother did not have a key); <u>Trulock v. Freeh</u>, 275 F.3d 391, 403 (4th Cir. 2001) (woman had no authority to consent to search of roommates files on shared computer when roommates files were password protected and woman did not know password); <u>United States v. Waller</u>, 426 F.3d 838, 845-46 (6th Cir. 2005) (owner of apartment had no authority to consent to search of guest's suitcase given owner's and guest's understanding that suitcase contained guest's private personal effects and guest never gave owner permission to open suitcase); 4 LaFave§ 8.3(f), at 166-171.

The government has failed to establish that Ms. Fischer had "common authority" over the basement of her and Mr. Price's home. The testimony at the hearing could not have been clearer. The basement was locked and Ms. Fischer did not have a key to get in. (T.42) Ms. Fischer told Schirra that she had access to the basement through Mr. Price, who had a key to the basement. (T.43) Under this scenario, it was not reasonable to recognize that Ms. Fischer had the right to permit an inspection of the basement in her own right and that Mr. Price had assumed the risk that Ms. Fischer would permit the basement to be searched. Just the opposite was true. Ms. Fischer only had access to the basement through Mr. Price. Mr. Price had taken clear, unmistakable steps to prevent anyone other than himself from permitting access to the basement. The government has utterly failed

to establish that Ms. Fischer had common authority over the basement. Accordingly, the government has failed to establish that Ms. Fischer had authority to consent to a search of the basement.

Ms. Fischer did not have apparent authority to consent to a search of the basement. The Supreme Court has held that even if a third-party does not have actual authority to consent to a search if the police reasonably, but mistakenly, believe that the third-party has authority to consent to a search a subsequent consent search does not violate the Fourth Amendment. Rodriguez, 497 U.S. at 186. However, the Court cautioned that this holding did not mean that police officers may always accept a person's invitation to enter premises.

> Even when the invitation is accompanied by an explicit assertion that the person lives there, the surrounding circumstances could conceivably be such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must "be judged against an objective standard: would the facts available to the officer at the moment . . . 'warrant a man of reasonable caution in the belief'" that the consenting party had authority over the premises?

Id. at 188.

In this case, Ms. Fischer's "invitation" to Schirra and Wilson with regard to the basement was that they could search the basement if they could break in without damaging the door. (T. 44, 67) Schirra had no idea whether Ms. Fischer had access to the basement other than through Mr. Price.

> She didn't have a key on her at that time. Whether she's ever had a key or had access to a key when he's home, I don't know. Maybe he's home and she just gets the key and goes down, I don't know. At that time she did not have a key. There were times that Johnny lets her in the basement. Why, I don't know if she doesn't have a key at the time when he does, I don't know, I'm not there.

(T.44) The facts available to Schirra and Wilson at the moment they entered the basement would not warrant a man of reasonable caution to believe that Ms. Fischer had authority over the basement. Accordingly, Ms. Fischer did not have apparent authority to consent to a search of the basement on

the evidence found during the search must be suppressed.

### Inevitable Discovery

At the hearing, the Court asked the following question: assume the initial consent was voluntary but also assume that consent was revoked after Schirra found the two pipes in the bedroom, could Schirra have obtained a search warrant for the house? (T.75) The answer is no for two reasons. First, a review of the warrant application that Schirra actually filed reveals that if the evidence illegally found in the basement is excised from the application there is no probable cause to search the house. Second, even if there was probable cause to obtain a warrant the fact that Schirra did not obtain a warrant but rather engaged in an illegal search of the basement requires the suppression of all items found in the basement.

A copy of Schirra's application and affidavit for search warrant presented to Judge Baxter is attached to Mr. Price's motion to suppress. If the Court excises all of the information found during the illegal search of the basement, the affidavit would end after paragraph 12. At that point the only information provided to Judge Baxter was that Mr. Price had been arrested on an outstanding warrant for a charge of unlawfully delivering methamphetamine to Schirra, that when Mr. Price was arrested at the garage on Marchmont Road he had plastic baggies and PH papers in his possession, and a search of Ms. Fischer's and Mr. Price's bedroom yielded several glass pipes with residue which appeared to be used to ingest controlled substances. That information would not support the issuance of a warrant for Mr. Price's house on Page Road to search for items listed in the warrant.

At the hearing, Schirra and Wilson indicated they had "source information" that Mr. Price was cooking methamphetamine at his home on Page Road and Schirra testified that during a search

11

of a dresser drawer in the bedroom he found sodium hypophosphite.  However, none of these facts

were in Schirra's application and affidavit for search warrant and the government cannot at this point

argue that those facts would have been included in Schirra's application if the items in the basement

had not been found.

The Court's question appears to assume that if Schirra could have obtained a warrant after

Ms. Fischer revoked her consent to search, even though he did not, the items found in the basement

could be admissible since they would have inevitably been discovered.  However, this application

of the inevitable discovery doctrine has been roundly rejected.  As Professor LaFave explains,

> "[I]t is essential that courts not lose sight of the fact that a mechanical application of
> the inevitable discovery doctrine will encourage unconstitutional shortcuts.  If the
> doctrine were applied when such a shortcut was intentionally taken, the effect would
> be to read out of the Fourth Amendment the requirement that other, more elaborate
> and protective procedures be followed.  This is particularly apparent when the
> shortcut was a bypassing of the Forth Amendment warrant requirement, as was
> recognized in United States v. Griffin, [502 F.2d 959 (6th Cir. 1974)].

6 LaFave § 11.4(a), at 269 (internal quotes omitted, footnotes omitted).  In Griffin, the Sixth Circuit

rejected the argument that the evidence from an illegal search should have been admissible under

the inevitable discovery doctrine because a warrant was being sought at the time of the illegal search

finding that "[a]ny other view would tend in actual practice to emasculate the search warrant

requirement of the Fourth Amendment."

The Eleventh Circuit has explained that under the inevitable discovery doctrine:

> if evidence is obtained by illegal conduct, the illegality can be cured only if the police
> possessed and were pursuing a lawful means of discovery at the time the illegality
> occurred.  The Government cannot later initiate a lawful avenue of obtaining the
> evidence and then claim that it should be admitted because its discovery was
> inevitable.  This is a sound rule, especially when applied to a case in which a search
> warrant was constitutionally required.  Because a valid search warrant nearly always
> can be obtained after the search has occurred, a contrary holding would practically

destroy the requirement that a warrant for the search of a home be obtained *before* the search takes place.

United States v. Satterfield, 743 F.2d 827, 846 (11th Cir. 1984) (emphasis in original).  The Ninth Circuit has articulated the same concern, noting that "to excuse the failure to obtain a warrant merely because the officers had probable cause and could have inevitably obtained a warrant would completely obviate the warrant requirement of the fourth amendment."  United States v. Echegoyen, 799 F.2d 1271, 1280 n.7 (9th Cir. 1986).

These concerns apply with equal force here.  If this Court were to find that the evidence found during Schirra's illegal search of the basement admissible under the inevitable discovery doctrine because Schirra **could** have obtained a warrant even though he did not it would eviscerate the warrant requirement and reward Schirra for violating Mr. Price's Fourth Amendment right to be free from unreasonable searches and seizures.  Such a finding would also eviscerate the deterrent effect of the exclusionary rule and must, therefore, be rejected.

WHEREFORE, defendant, John Joseph Price, Jr., respectfully requests that this Honorable Court grant his motion to suppress and suppress all evidence found during the search of the garage on Marchmont Road and the search of Mr. Price's home on Page Road.

Respectfully submitted,

/s/ Thomas W. Patton
Thomas W. Patton
Assistant Federal Public Defender
PA I.D. No. 88653

13