IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 04-50 Erie |
| | ) | |
| JOHN JOSEPH PRICE, JR. | ) | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF THE MOTION TO SUPPRESS EVIDENCE**

AND NOW comes the United States of America, by and through its counsel, Mary Beth Buchanan, United States Attorney for the Western District of Pennsylvania, and Christian A. Trabold, Assistant United States Attorney for said district, and states as follows:

**A.   The search of Price's coat during his arrest on Marchmont Road was lawful as a search incident to his arrest.**

On October 5, 2004, at approximately 6:45 P.M., Price was arrested at a garage near Route 97, just south of Interstate 90, on an outstanding arrest warrant from the Erie County Court of Common Pleas for delivery of methamphetamine. Price was inside the garage when officers approached to execute their arrest warrant. During the course of Price's arrest, after he had been removed from the garage and handcuffed, officers located a quantity of sodium hypophosphite, a methamphetamine precursor chemical, inside Price's coat. The coat was in close proximity to a bag which contained, in a mesh outside pocket, in plain

view, an ammunition magazine.

It is well settled that a warrantless search of an arrestee is valid when conducted incident to a lawful arrest. Chimel v. California, 395 U.S. 752, 763 (1969); New York v. Belton, 453 U.S. 454, 461 (1981).  The scope of a search incident to arrest is not limited to an arrestee's person, but extends to an area within the arrestee's immediate control.  Chimel v. United States, 394 U.S. 752, 763 (1960).  A search of that area is permissible regardless of whether it is likely that weapons or evidence will be found there.  United States v. Robinson, 414 U.S. 218, 235 (1973).

Price argues that the evidence from his coat must be suppressed because he was already handcuffed and outside the garage when the officers looked into the coat and found the contraband.  Thus, according to Price his coat was no longer in his immediate control and the search of it was not incident to his arrest.  Price is mistaken.

The police may conduct searches incident to arrest, even though the arrestee has been handcuffed and cannot gain access to the area formerly under his immediate control.  See Government of Virgin Islands v. Rasool, 657 F.2d 582, 585, 588-89 (3d Cir. 1981).  In Rasool, the Third Circuit upheld a search incident to arrest despite the arrestee being handcuffed and removed from a vehicle prior to the search. See United States v.

Massenberg, 45 Fed. Appx. 115, 120 (3d Cir. 2002)(even when an arrestee is handcuffed a search of the area that was within his immediate control when he was arrested is valid so long as the search occurs close in time to the arrest).

The critical time for analysis of whether a search is incident to an arrest is the time of the arrest, not the time of the search. In re Sealed Case, 153 F.3d 759, 767 (D.C. Cir. 1998). Thus, the area under a defendant's "immediate control" for Chimel purposes must be examined as of the time the arrest occurs. Id. at 768, citing, United States v. Brown, 671 F.2d 585 (D.C. Cir. 1982). In so holding, the Sealed Case court noted that "making the test turn exclusively on the time of the search might create a perverse incentive for an arresting officer to prolong the period during which the arrestee is kept in an area where he could pose a danger to the officer." Id. (citation omitted). The inquiry is simply "whether the arrest and search are so separated in time or by intervening events that the later cannot fairly be said to have been incident to the former." Id.

In Sealed Case, a police officer chased the defendant into a residence in a hot pursuit type scenario. The defendant then ran upstairs and attempted to hide in a bedroom. The officer followed and ultimately apprehended the defendant in the bedroom. Once the defendant was apprehended he was brought downstairs and handed off to another officer. The arresting

officer then went back upstairs and upon examining the room where the defendant was caught, located narcotics and a gun in the area where the defendant had been standing. The court held that the search of the bedroom was lawful as a search incident to arrest even though the defendant was not in close proximity to the bedroom when it was searched. Id. at 769.

Numerous other courts have also consistently held that:

> the right to search an item incident to arrest exists even if that item is no longer accessible to the defendant at the time of the search. So long as the defendant had the item within his immediate control near the time of his arrest, the item remains subject to a search incident to arrest.

Northrop v. Trippett, 265 F.3d 372, 379 (6th Cir. 2001); United States v. Nelson, 102 F.3d 1344, 1347 (4th Cir. 1996)(upholding search of defendant's bag after agents had removed it from him and taken him to another room for questioning); United States v. Mitchell, 64 F.3d 1105, 1110-11 (7th Cir. 1995)(upholding search of items after defendant was handcuffed); United States v. Cotton, 751 F.2d 1146, 1147-48 (10th Cir. 1985)(arrestees handcuffed and guarded by officer while vehicle searched); United States v. Hudson, 100 F.3d 1409, 1419 (9th Cir. 1996)(defendant handcuffed and removed from house); United States v. Hernandez, 941 F.2d 133, 136-37 (2nd Cir. 1991)(search of bedroom and under the defendant's bed valid even though defendant handcuffed).

Price's reliance upon United States v. Myers, 308 F.3d 251 (3d Cir. 2002) is misplaced for several reasons. First, the

4

Myers majority's reasoning regarding the search incident to arrest issue lacks precedential value as it is totally unnecessary to the majority's decision that the initial arrest lacked probable cause. United States v. Myers, 308 F.3d at 284 (Alacron, J., dissenting). Second, the majority fails to cite even one case in support of its reasoning that the weapons at issue were inaccessible to the defendant. Id. Third, the overwhelming weight of authority directly contradicts the advisory opinion offered by the Myers majority on the search incident to arrest issue. This explains the majority's failure to cite any cases in support of their position. Myers is thus deeply flawed and not in accord with well established precedent from multiple other Courts of Appeals.

Here, Price's coat, from which the listed chemical was found, was plainly within his immediate control prior to his arrest. Price was arrested inside a small office in a garage. The coat was located inside the office in this garage when Price was apprehended. Thus, the coat was in an area within Price's immediate control at the time of the arrest. Likewise, the coat was searched while Price was still on scene, as such, the search of the coat was not unjustifiably separated in time from Price's arrest. Therefore, the contraband found in Price's coat should not be suppressed.

### B.    The hearing testimony clearly established that Fischer consented to the search of her home.

On October 5, 2004, Pennsylvania Bureau of Narcotics Investigation (BNI) Agent Randall Schirra and Pennsylvania State Trooper Ron Wilson traveled to Price's home for two reasons. First, at Price's request, the officers went to his residence to ensure that his wife, Debbie Fischer, was contacted to watch Price's children, since they were unsupervised and Price, who was supposed to be home with the children, was now under arrest. (NT 6). Second, the officers wanted to obtain consent to search the home. (NT 6).

When the officers arrived at the Price home, they spoke briefly to Price's children, but did not enter the residence and look around. (NT 8).  They then called Fischer at her place of employment and she left work and came home. (NT 8).  While en route, Fischer ran out of gas.  She was then picked up by BNI Agent Tim Albeck and driven to the residence. (NT 8).

Once on scene, Agent Schirra explained to Fischer that Price was under arrest for methamphetamine delivery. (NT 9). Schirra further advised Fischer that he had information that Price was involved in methamphetamine manufacturing at the residence.  Fischer was asked to consent to a search of the residence so that the officers could make sure it was a safe environment for Fischer and her children. (NT 9).

At no time did any officer have his gun drawn. No officer touched Fisher or was in any way physically menacing. The conversation between Fischer, Agent Schirra and Trooper Wilson took place in her front yard. (NT 10) Fischer was not handcuffed or restrained in any way. Fischer was not told that if she refused to consent the officers would just go get a search warrant. (NT 10). Fisher was not told that she was under arrest.

Price claims that the Fischer's consent was invalid because she was not told that the officers would seek to prosecute her or Price if they found items indicative of methamphetamine production. Price claims that by failing to reveal this information the officers engaged in deception and trickery.

Price's reliance upon United States v. Carter, 884 F.2d 368 (8th Cir. 1989) is entirely misplaced. The Carter court specifically reasoned that deception by the police, standing alone, does not invalidate consent. Id. at 375. In United States v. Tukes, 911 F.2d 508, 516 (11th Cir. 1990), the Eleventh Circuit rejected the defendant's contention that his consent was involuntary because the police did not tell him he was the sole suspect in a murder. See United States v. Turpin, 707 F.2d 332 (8th Cir. 1983).

Rather, as is well settled, validity of consent must be examined by reference to the totality of the circumstances.

Schneckloth v. Bustamonte, 412 U.S. 218, 233 (1973).  Here, even assuming that the officers used deception, which the government flatly rejects, the totality of the circumstances indicates that Fischer's consent was voluntary.  Price points to no other facts which even remotely lead to the conclusion that Fischer's consent was invalid.

Nothing in the law requires police officers to essentially Mirandize someone prior to obtaining a consent to search.  Price has failed to cite even one case in support of the notion that the officers were required to tell Fischer that any evidence found would be used to prosecute her or Price.  Only someone divorced from their senses would have concluded that if contraband was found the offices would not seek prosecution. Nor was Fischer ever told that no prosecution would be forthcoming if items were found.  Moreover, Fischer's age and previous experience with the criminal justice system made it even less imperative for the officers to explain the obvious to her.

Likewise, the officers were concerned about the safety of Fischer and her children as evidenced by the fact that once hazardous chemicals were found in the basement, the area was immediately secured, the children were removed from the home and Fischer was advised to take the children to the hospital to be checked for chemical exposure. (NT 16).

Therefore, Fischer's consent was valid because there

was no deceit by the officers and the totality of the circumstances indicates that there was no coercion or duress which forced Fischer to succumb to the officers' pressure.

### C. Fischer did not revoke her consent to search the basement area.

While searching the bedroom shared by Price and Fischer on October 5, 2004, Agent Schirra located several glass pipes he suspected were used to ingest methamphetamine. (NT 11). Also discovered in the bedroom, in a dresser drawer, was a bag containing a white crystalline substance which Agent Schirra believed to be sodium hypophosphite, a methamphetamine pre-cursor chemical. (NT 13). Upon finding this baggie, Fischer asked Agent Schirra to stop searching the house part, upstairs[1]. (NT 13, 41). Agent Schirra then honored Fischer's request and ceased searching in the bedroom and the upstairs portion of the home.

Agent Schirra then inquired as to how you get to or access the basement. (NT 22). Fischer explained that there was no access to the basement from inside the house and that to get to the basement you have to go outside. (NT 22). Fischer then asked Agent Schirra to follow her outside, whereupon she then led

---

[1] When questioned by the Court, Agent Schirra indicated that Fischer told him to stop searching in the dresser drawers in the bedroom. (NT 21). The government has chosen to focus on Agent Schirra's testimony that Fischer told him to stop searching the house part or upstairs since that is the best case scenario for Price. If the Court deems suppression unwarranted under that factual underpinning, then it is clear that suppression is not warranted based upon the even stricter "dresser drawer" limitation.

Agent Schirra to the basement door which could only be accessed from outside the residence. (NT 22)

If a person revokes consent prior to the time the search is completed, then the police may not thereafter search in reliance upon the earlier consent. United States v. Lattimore, 87 F.3d 647, 651 (4th Cir. 1996)(citations omitted). However, a refusal to execute a written consent form subsequent to a voluntary oral consent does not act as an effective withdrawal of the prior oral consent. Id. (citations omitted).

Here, Agent Schirra honored Fischer's limitation of her consent when she indicated that she wanted him to stop searching upstairs. Agent Schirra immediately stopped searching. At no time did Fischer tell the officers on scene to leave her property or stop searching entirely. Rather, she exercised her ability to limit the search area, which Agent Schirra fully complied with. After Agent Schirra inquired about access to the basement, Fischer revealed that the basement was not accessible from inside the house. She then led Agent Schirra to the basement when he inquired about access to that area. At no time during their walk to the basement did Agent Schirra restrain, touch or handcuff Fischer. Nor was Fischer told that Agent Schirra would just obtain a search warrant if she did not consent to a search of the basement. Fischer was not placed under arrest. When they arrived at the door to the basement, the officers specifically

asked for permission to enter the area. The officers did not just barge into the area without first getting Fischer's approval. Thus, Fischer merely limited the scope of her consent because she did not order Agent Schirra to stop searching entirely or tell him to leave, but rather just limited the area that could be searched.

Further, the officers did not rely upon Fischer's initial consent to search because Fischer provided a wholly new consent to search relative to the basement area, which was valid, in and of itself, especially given the absence of any coercion or duress. Indeed, Fischer's consent to search the basement is arguably even stronger than her initial consent because it comes after Fischer was now well aware that she did not have to consent and could limit or stop her consent at any time. Trooper Wilson indicated that while Fischer appeared a little nervous, which was not unusual given the circumstances, there was nothing about her demeanor which caused Trooper Wilson to conclude that she was under duress. In fact the record indicates just the opposite because Fischer's consent to search the basement came only after it had become clear to her that she had the authority to limit the searching.

Price cites dicta indicating that the police must stop searching and leave when consent is revoked. That dicta is inapplicable here because Fischer did not revoke her consent, she

merely limited it, and, in any event, she provided another consent to search a different area subsequent to her limitation, which was not the product of coercion or duress.

Likewise, Price claims wrongly that Fischer's consent to search the basement was invalid as it was simply a submission to a claim of lawful authority. There was absolutely no claim of lawful authority from Agent Schirra or Trooper Wilson. See Bumper v. North Carolina, 391 U.S. 543 (1968). At no time prior to entry into the basement did any officer mention obtaining a search warrant. Nor did anyone tell Fischer she had to consent or apply pressure to her in any way. Again, by the time Fischer led Agent Schirra to the basement she was keenly aware that she was in charge because she had just limited Agent Schirra's bedroom search. Thus, any claim that Fischer merely submitted to a claim of lawful authority is contradicted by the record and common sense.

Lastly, Price claims that Fischer's limiting statement to Agent Schirra obviously covered the whole house because the basement is part of the house. Price is wrong for several reasons. First, Fischer herself, even in a light most favorable to Price, limited her statement to Agent Schirra to the upstairs portion of the house. Fischer could have easily ordered Agent Schirra to stop entirely or to leave the property yet she chose not to do so. Second, in light of the highly unusual access to

the basement from only outside the residence, it is very far from obvious that the basement is as integrated into the rest of the home as Price would have this Court believe.  The record is clear that the basement could not be accessed from inside the house.  Thus, there is clearly a distinct separation between the house and the basement.  Third, Price claims later in his pleading that Fischer did not have the authority to consent to a search of the basement.  This leads to the inescapable conclusion that Price himself deems the basement to be a separate and distinct part of the property, otherwise Fischer would plainly have authority over the basement, as well as the rest of the house.

> **D.   Fischer had the authority to consent to the search of the basement.**

Price claims that Fischer's consent to search the basement is invalid because without a key she did not have actual or apparent authority to consent.  Again Price is mistaken.

It is well established that the "consent of one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared." United States v. Matlock, 415 U.S. 164, 169 (1974).  Common authority rests upon "mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own

right and that the others have assumed the risk that one of their number might permit the common area to be searched." Id. at 171, n.7.  Consent to search an area in which another person maintains a privacy interest is valid if two conditions are satisfied:

> the third party had (1) access to the area searched, and (2) either, (a)common authority over the area; or (b) a substantial interest in the area; or (c) permission to gain access [to the area].

United States v. Snype, ___ F.3d ___, 2006 WL 695651 (2nd Cir. 2006)(citations omitted)(internal quotations omitted).  The Second Circuit in Snype unequivocally reasoned that "there is no question" that the lessor and resident of an apartment had "the access and authority necessary to consent to a search of the entire premises." Id.  Generally, "one spouse has the authority to consent to a search of a premises jointly occupied by both spouses."  United States v. Duran, 957 F.2d 499, 503(7th Cir. 1992).  Moreover, "a spouse presumptively has authority to consent to a search of all areas of the homestead; the nonconsenting spouse may rebut this presumption only by showing that the consenting spouse was denied access to the particular area searched."  Id. at 505.

Price makes much of the fact that Fischer did not have a key to the basement.  Fischer's lack of a key, standing alone, is not enough to destroy her authority to consent.  While

14

possession of a key to the premises is a factor to be considered in the common authority analysis, "it is only one factor in a multi-factored factual question that turns on the access, use and reasonable expectation of the parties involved." United States v. Ramirez, 115 F.Supp.2d 401, 408, n. 14 (S.D. NY 2000)(citation omitted).

Indeed, numerous cases have held that an estranged spouse without working keys to the marital residence may still consent to a search of the residence, even if considerable time has elapsed since they abandoned the residence. United States v. Backus, 349 F.3d 1298 (11th Cir. 2003)(valid consent to search the home provided by battered spouse who had left home six months prior to the search even though locks had been changed); United States v. Gevedon, 214 F.3d 807, 808-11 (7th Cir. 2000)(consent search by estranged wife, who no longer lived in the home, valid even though locks had been changed and wife was unaware of the location of a special socket which was needed to gain access to the attic which contained illegal firearms); United States v. Brannan, 898 F.2d 107, 108 (9th Cir. 1990)(battered wife's consent to search valid even though she had moved out and locks had been changed); United States v. Long, 524 F.2d 660, 661-62 (9th Cir. 1975)(estranged wife who maintained separate residence validly consented to search of marital home even though locks had been changed).

Here, Fischer, whom Price described as his wife (NT 6), unquestionably was living at the Page Road residence when she consented to the search. She indicated to Agent Schirra and Trooper Wilson that she did laundry and stored household items, such as Christmas decorations, in the basement (NT 14, 42). It would be highly unreasonable for the officers to have concluded that Fischer did not have the authority to consent to the search of her own basement just because she did not have the key. At no time did Fischer say she was forbidden by Price from entering the basement. Nor did Fischer say she never went in or used the basement. Unless the officers were to conclude that Fischer's laundry duties were only undertaken under the watchful eye and with the permission of Price then it would have been unreasonable for them to conclude that Fischer did not have authority over her own basement. Likewise, Price has failed to rebut the presumption that Fischer, as his spouse, was authorized to consent because it is quite clear that Fischer has access to the basement.

Further, Price cannot have it both ways. On the one hand he argues that Fischer's alleged revocation of consent covered the whole home, including the basement, since the basement is obviously part of the home. On the other hand, he argues that Fischer did not have authority over the basement and could not consent to a search of it. Apparently, Fischer had

16

authority over the whole building when allegedly revoking consent but did not have the same authority when she was providing consent. Such an argument is fatally illogical and inconsistent and does not form a basis for the suppression of evidence in this case.

> **E.   The search warrant contains sufficient facts to establish probable cause after the allegedly tainted information is removed.**

Probable cause is assessed in light of the totality of the circumstances. Illinois v. Gates, 462 U.S. 213, 238 (1983). In determining whether probable cause for a search warrant exists, the job if the judicial officer "is simply to make a practical, common-sense decision whether, given all circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons suppling hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Id.

While the government does not believe any tainted information was included in the search warrant, as Fischer's consent to search the basement was valid, if the court deems said information to be tainted, the procedure is straightforward. The court simply examines the search warrant affidavit for probable cause after removing the allegedly tainted information. United States v. Herrold, 962 F.2d 1131, 1138 (3d Cir.), cert. denied, 506 U.S. 958 (1992), United States v. Jenkins, 396 F.3d 751, 758-

17

60(6th Cir. 2005). If probable cause remains without the faulty facts then the evidence should not be suppressed. Id.

Here, assuming arguendo that the information obtained from the search of the basement was tainted, the search warrant still contains sufficient probable cause to search Price's residence even when that allegedly tainted information is excised. Without that information, the warrant indicates that Agent Schirra, in an undercover capacity, purchased methamphetamine from Price on April 5, 2002. As a result of that transaction, Agent Schirra charged Price with Unlawful Deliver of methamphetamine and Possession with Intent to Distribute methamphetamine in violation of 35 Pa.C.S.A. § 780-113(a)(30).

The affidavit further reveals that Price was arrested on those Pennsylvania charges on October 5, 2004, the day his residence was searched. When arrested Price was found in possession of various items indicative of methamphetamine trafficking, including plastic baggies with methamphetamine residue and PH papers used to gauge the acidity of the methamphetamine production process. Moreover, the consent search of Price's bedroom which occurred on October 5, 2004, uncovered several glass pipes which Agent Schirra knew from experience were used to ingest controlled substances. This is the sum and substance of the information available to the magistrate after

removing the allegedly tainted facts.  This information establishes probable cause to conclude that inside Price's residence would be found evidence of his involvement in and manufacture of methamphetamine.  The remaining facts when considered as a whole establish that there is a "fair probability" that additional contraband will be found in Price's residence.  As a result, the search warrant is valid and suppression of the evidence is not warranted.

    WHEREFORE, for all of the reasons stated herein the government respectfully requests that Price's Motion to Suppress be denied.

Respectfully submitted,

MARY BETH BUCHANAN
United States Attorney


s/Christian A. Trabold
CHRISTIAN A. TRABOLD
Assistant U.S. Attorney
PA ID No. 75013