IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.                          CRIMINAL NO. 04-50 ERIE

JOHN JOSEPH PRICE, JR.

HEARING ON DEFENDANT'S MOTION TO SUPPRESS - DAY NO. 2

Proceedings held before the HONORABLE

SEAN J. McLAUGHLIN, U.S. District Judge,

in Courtroom C, U.S. Courthouse, Erie,

Pennsylvania, on Thursday, May 4, 2006.

APPEARANCES:
    CHRISTIAN A. TRABOLD, Assistant United States
    Attorney, appearing on behalf of the Government.

    THOMAS W. PATTON, Assistant Federal Public

Defender, appearing on behalf of the Defendant.

Ronald J. Bench, RMR - Official Court Reporter

2

1          P R O C E E D I N G S

2

3          (Whereupon, the proceedings began at 10:30 a.m., on

4   Thursday, May 4, 2006, in Courtroom C.)

5

6          THE COURT:  This is the time that we set for a

7   post-hearing argument at Criminal No. 04-50 Erie.  And by way

8   of background, there was a supplemental pleading filed by the

9   defendant and addressed by the government with respect to the

10   search at the garage.  Mr. Trabold, I guess you've got the

11   burden here, what do you want to tell me?

12          MR. TRABOLD:  Yes, your Honor.  I think there are

13   five points raised in the supplemental motion, I'll just kind

14  of take those in order.  I won't belabor the point because we

15  have a rather lengthy filing.  With regard to the first issue,

16  which is the search of Mr. Price's coat at the time of his

17  arrest.  The cases are clear that the issue in the search

18  incident to arrest is the scope of the person's control.  And

19  the cases say that it's permissible, even if the arrestee is

20  handcuffed with no access to the area at the time of his

21  arrest.

22          THE COURT:  Aren't I bound by Myers, isn't Myers on
                                          _____         _____

23  all-fours here in establishing a geographic and temporal

24  proximity?  Here the fellow was handcuffed, he's outside the

25  garage at the time of the search, how do I square that with


                                    3


1  Myers?
   _____

2          MR. TRABOLD:  I don't think you're bound by Myers,
                                                       _____

3  because the overwhelming weight of the cases, first from the

4  Third Circuit, as well as the cases from other circuits across

5  the country, is directly the opposite of what Myers holds.
                                                 _____

6  Myers, it appears to me anyway, to be out on an island by

7  itself.

8         THE COURT:  But it's my island, isn't it?

9         MR. TRABOLD:  We appear to be living in the island,

10  your Honor.  It just doesn't make -- first of all, the dissent

11  in that case lays out the issue as to the search incident to

12  arrest really isn't, really amounts to be an advisory opinion

13  from the Third Circuit panel in that case.  It also points out

14  the fact that it's evident from our brief that there's no

15  citation to even any case law whatsoever in support of the

16  Myers majority's opinion in that case.  So our position is that

17  you're not bound by the Myers' opinion because the Myers'

18  opinion, as the dissent points out, lacks precedental value on

19  the issue of search incident to arrest because that decision

20  was not necessary to their disposition of the case.

21         THE COURT:  In other words, it was dictum?

22         MR. TRABOLD:  Correct, dicta certainly would be an

23  easier way to say that.

24         THE COURT:  Okay.

25         MR. TRABOLD:  Separate and apart from Myers, the

4

1   cases are clear, and overwhelmingly so, that in a factual

2   setting of this type that you have before you here today, that

3   that is a lawful search incident to arrest, and really what it

4   amounts to was the item within Mr. Price's control at the time

5   he was arrested, not at the time when the officers may have

6   gone through the bag.  The item clearly was within his control.

7   He was arrested in what amounts to be a garage, in the back

8   office of the garage.  The bag was in the office of the garage.

9   So the item was clearly --

10        THE COURT:  What does the record show on that again.

11   They come in, the garage door is open, as I remember, they go

12   in --

13        MR. TRABOLD:  It's my recollection of the record

14   and, obviously, the record is what the record is, but my

15   recollection of record is it's a relatively run of the mill

16   standard size garage.  They go into the garage to arrest Mr.

17   Price and he's in kind of the back, there's kind of a back

18   office to the garage, which by it's nature is smaller than the

19   general rest of the outer garage.  He's in this back office

20  there, they arrest him in there and that's where the bag is

21  found in that small back office, that's my recollection of the

22  record.

23       THE COURT:  All right.

24       MR. TRABOLD:  With regard to the issue of whether

25  Ms. Fischer consented to the search of the house in the first

5

1  instance.  The cases are clear that you have to look at the

2  totality of the circumstances.  And my reading, obviously, I

3  don't speak for counsel, but my reading of the defense brief is

4  that really the underpinning of their argument is that the

5  officers used deception when they got her to consent.  I would

6  categorically reject that.  The officers did not use deception

7  when they got her consent.  But perhaps even more importantly,

8  even if you find they did use deception, that in and of itself,

9  the cases hold, is not enough for you to find that there was no

10  consent.  You still need to look at the totality of the

11  circumstances.  In this case the record is completely void of

12  any indication that anyone coerced Ms. Fischer in even the

13  slightest regard.  No weapons drawn, nothing like that.  In

14  fact, the officers took the step, when they realized she wasn't

15  home, of calling her.  And then when apparently she had some

16  trouble or ran out of gas, they went and brought her to the

17  house.  The consent was given in essentially what amounts to

18  the front yard of the house.  She has prior experience with the

19  criminal justice system.  And is roughly a middle aged,

20  approximately, by my recollection, a 40-year-old woman.

21        THE COURT:  Are they in fact married, does the

22  record reflect that, because there's a reference to Mrs. Price?

23        MR. TRABOLD:  The record indicates that Mr. Price

24  referred to her as his wife.  I don't know if the record takes

25  the additional step, my understanding is the relationship is a


                              6


1  common-law relationship, there's no actual marriage license.

2  But I could be wrong on that, I don't know if the record takes

3  that additional step.

4        THE COURT:  So it would be inaccurate to be

5  referring to her as Mrs. Price?

6        MR. PATTON:  Your Honor, I think Mr. Trabold is

7  correct insofar as what's in the record, they are not married.

8      THE COURT:  They call her Mrs. Price in the record?

9      MR. PATTON:  Ms. Fischer and Mr. Price are not

10  legally married.  So I believe it's accurate to refer to her as

11  Ms. Fischer.

12      THE COURT:  All right.  That's fine.

13      MR. TRABOLD:  I think what the record does indicate

14  is that when Mr. Price was arrested, he indicated to the

15  officers or made a general request, hey, can somebody try to

16  reach out to my wife and let her know I'm not going to be home

17  because I was supposed to be watching the kids tonight.

18      THE COURT:  Tell me your position, factual and

19  legal, in response to the defendant's position that there was a

20  revocation of consent?

21      MR. TRABOLD:  Well, I have a variety, a number of

22  different responses to that.  Number one, I do not believe the

23  record indicates that there was a revocation of consent.  At

24  the most the record indicates that Ms. Fischer limited the

25  scope of her consent when she said, and there is some variance

7

1  in the record, but as I point out in my footnote, even if you

2   take the statement from Agent Schirra that's most beneficial to

3   Mr. Price and you base your decision on the factual

4   underpinning that Ms. Price or Ms. Fischer said I want you to

5   stop searching upstairs/the house part, even if you accept that

6   as what she said and base your decision on that statement,

7   separate and apart from the dresser drawer statement that Agent

8   Schirra made to you when you questioned him specifically, that

9   is not a revocation of consent.  That's a limitation of the

10   scope of her consent, which was well within her rights,

11   obviously, under the case law, a person can either flat out

12   withdraw or revoke their consent or limit the consent.  What's

13   illustrative in the record she did not say and there is no

14   indication in the record from either party that at any point in

15   time she just made the general statement I want you to stop

16   searching.  Or please leave my property or get out of here now,

17   I'm done.  And having not made that statement, by her own words

18   she did not revoke her consent.  She merely limited the area in

19   which they could search.  And our additional point and perhaps

20   the most important point in our brief is that what then

21   happened is that Agent Schirra honored that limitation,

22   inquired as to the location of the basement, and then was led

23    to the basement by Ms. Fischer.  And then provided an entirely

24    new consent to search that area.  And the reason I call it a

25    new consent is that the officers did not then just begin to

8

1    attempt to access the basement.  They asked her anew, is it

2    okay if we go into this area.  They didn't just consider that

3    her prior consent was still perfectly valid, perfectly lawful.

4    They went the additional step, asked her anew, attempted to get

5    a new or new permission from her to go into that area, which

6    she did then provide.  So even if you were to consider that she

7    revoked that earlier consent, the record is clear that they

8    then obtained, the record again is completely devoid of any

9    coercion whatsoever, that they then went ahead and obtained

10    another consent from her once they were in the basement area.

11    And the record is also clear that her demeanor was not,

12    according to Trooper Wilson, was not of a person whose will was

13    being overborne or who had been intimidated or threatened by

14    Agent Schirra when Trooper Wilson was in another area where he

15    couldn't have heard the conversation.

16        THE COURT:  What about this authority issue?

17          MR. TRABOLD:  Your Honor, my opinion on the

18    authority issue is that should be the easiest issue for you to

19    resolve in this case.  Because the case law is overwhelming

20    clear, from the Duran case, as well as all the other cases that
                _____

21    we cited, that a spouse has the presumptive authority to

22    consent and that to consent to what amounts to, I guess the

23    description would be the marital property.  In this case the

24    officers, that case law is applicable here because Mr. Price

25    himself referred to Ms. Fischer as his wife.  And they were at


                                9


1    a minimum co-habitating in the residence there on Page Road.

2    And the Duran case says the spouse has presumptive authority
          _____

3    which may only be rebutted by a showing that the spouse was

4    denied access to the area searched.  There's no indication

5    whatsoever that she was denied access to the area searched.

6    In fact, the record indicates that she did the laundry in that

7    area, stored various household items.  The thrust of the

8    defense argument is that she didn't have the key.  Well, again,

9    in and of itself is not enough to show that a person doesn't

10   have the authority to consent.  And I cited what amounts to a

11   laundry list of cases which are somewhat in the area of the

12   battered spouse area.  That repeatedly show that even in cases

13   where a spouse did not have the key and was gone from the

14   property for months and months and months, that that spouse

15   still had the authority to consent.  Now, even if you wanted to

16   separate the spousal cases out, the Snype case pretty much lays
                          _____

17   out what your test is for whether a person has the authority to

18   consent.  That test is, number one, access.  And then any of

19   the following three.  Either common authority, substantial

20   interest, or permission to gain access.  Under the Snype test,
                          _____

21   separate and apart from the analysis of whether Ms. Fischer

22   qualifies I guess as a spouse, under the Snype test you still
                          _____

23   have more than enough in the record to conclude that she had

24   the authority to consent to the search.

25         THE COURT:  When they went into the basement and


                              10


1   found the materials consistent with methamphetamine production,

2   and then they obtained the search warrant, and then they went

3  back to the house, just by way of rounding out my background

4  knowledge, what more did they find when they went back than

5  they found when they were there on the consent search?

6        MR. TRABOLD:  I think it's not so much more as it is

7  it is a greater ability to analyze what was there.  Because in

8  a meth situation when you go in, they went in on a consent

9  search, they go in there and they kind of -- I don't want to

10  say they do a cursory look because it's a little bit more than

11  that because they're trying to determine exactly what it is

12  that might be there.  But what I mean is once they're able to

13  determine hey, it looks like we have what amounts to a meth lab

14  or what may be a meth lab, their mode of operation is to

15  quickly get out of the area for safety purposes.

16        THE COURT:  Then come back and secure it?

17        MR. TRABOLD:  Right, then come back with their

18  safety suits on and their breathing apparatuses on and secure

19  it under conditions where they know that their safety can at

20  least be assured as much as possible.

21        THE COURT:  Was anything else found in his jacket of

22  an incriminating nature besides the sodium hypophosphite, do

23  you know from the record?

24          MR. TRABOLD:  I don't think -- well, I don't know if

25  the record indicates more in his jacket being found other than


                              11


1  the listed chemical.

2          THE COURT:  The sodium hypophosphite?

3          MR. TRABOLD:  Correct.

4          THE COURT:  Is that what it was?

5          MR. TRABOLD:  That was the listed chemical.

6          THE COURT:  Is there anything else that you want to

7  tell me?

8          MR. TRABOLD:  The last argument that we make finally

9  is that if the court is inclined to say that the consent, none

10  of this consent information can be validly sustained and the

11  consent was not valid, even in the circumstance where that

12  would be your conclusion, it's our position that the case law

13  requires you to take essentially all that what we'll call

14  tainted information out of the search warrant and then assess

15  whether there's enough in the warrant to justify the search

16  without that tainted information.

17          THE COURT:  What would you be left with then?

18          MR. TRABOLD:  What you would be left with is

19    information in this warrant that Mr. Price had distributed or

20    delivered methamphetamine to Agent Schirra in the past.  That

21    he had been arrested on the day in question.  That he had items

22    indicative of methamphetamine production on him, separate and

23    apart from the listed chemical found in his coat.  And that

24    when --

25          THE COURT:  Say that one to me again?


                              12


1          MR. TRABOLD:  I think, I'm pretty sure, I apologize

2    I didn't look at the warrant right before I came down here.

3    But I think the warrant indicates -- there's no mention

4    whatsoever in the warrant of the sodium hypophosphite found in

5    the jacket, that's without question.  But I think, again, if

6    I'm wrong I apologize, but I think the search warrant indicates

7    that at the time of his arrest, the arrest in the garage, Mr.

8    Price had items, separate and apart from the sodium

9    hypophosphite, on his person which are indicative of

10    methamphetamine distribution and/or production.  And just by

11    way of example, I think one of the items would be pH papers,

12  which are commonly known to be used to determine acidity levels

13  in the production of methamphetamine.

14        THE COURT:  Could it be that the sodium

15  hypophosphite that was found in the dresser drawer wasn't

16  included, but the sodium hypophosphite that was found in his

17  coat was?

18        MR. TRABOLD:  No, it's definite that the stuff found

19  in the dresser drawer wasn't included.  But I also don't think

20  there was any mention made of the chemicals found in the bag.

21        THE COURT:  I'll just look at the affidavit again.

22        MR. TRABOLD:  Sure.  What you have is a person that

23  more than indicates distributed methamphetamine to Agent

24  Schirra, and on the day in question was arrested for that

25  offense.  He had items indicative of involvement with


                              13


1  methamphetamine on his person.  Then they traveled to his

2  house, while at his house they found, I believe the warrant

3  indicates more than one pipe which would commonly be used to

4  ingest methamphetamine.  It's our position that that

5  information in and of itself provides probable cause, separate

6    and apart from all the other information, to justify the search

7    of Mr. Price's house.

8           THE COURT:  All right, thank you.  Okay, Mr. Patton.

9           MR. PATTON:  Your Honor, first starting with the

10   search at the garage on Marchmont Road.  I think Myers is

_____

11   controlling on you.  And I also respectfully disagree with Mr.

12   Trabold's memory of what the record shows as to with regard to

13   where the coat was located.  In actuality the record does not

14   state where the coat was located within this garage.  Whether

15   it was in this back small office area --

16          THE COURT:  I think that's correct.  The only

17   geographic placement of the jacket, as I remember the record,

18   was within a few feet of the knapsack.

19          MR. PATTON:  Correct.  The record from the hearing

20   does not state whether that knapsack and coat were in the

21   office part of this garage or if that jacket and coat were out

22   in the main part of the garage.  So that the government has not

23   established that the coat was within Mr. Price's area of

24   control at the time he was arrested.  So there's a basic

25   failure to show factually that the coat was within Mr. Price's

1  area of control at the time of the arrest to justify a search

2  of it incident to arrest.  And that given that absence of

3  evidence, the government hasn't met its burden of proving that

4  this was a valid search incident to arrest.  With that

5  attitude, the Myers case says that your Honor would have to
   _____

6  find that the government hasn't established that this was a

7  valid search incident to arrest.

8         THE COURT:  Let's go on to the other part.

9         MR. PATTON:  At the house, and we're talking about

10  the initial consent or lack thereof.  I believe the evidence

11  indicates, and both Agent Schirra and Trooper Wilson both

12  repeatedly stated that Ms. Fischer was told that they wanted to

13  search inside the house area for items indicative of the

14  manufacturing of methamphetamine.  Saying that they needed to,

15  for safety reasons, see if there was anything like that in the

16  house, it was for the safety of Ms. Fischer and her children,

17  because they didn't want to see anybody get hurt.  They did not

18  inform Ms. Fischer that she had the right not to consent.  They

19  did not inform Ms. Fischer that anything found that could

20  incriminate either herself or Mr. Price would be used in fact

21   to try and incriminate Ms. Fischer or Mr. Price.

22        THE COURT:  Didn't they tell her they had evidence

23   there was methamphetamine production going on?

24        MR. PATTON:  They said that they had information

25   that methamphetamine activity had been occurring.  I believe


                        15


1   what the testimony was, was Ms. Fischer responded to that well,

2   Mr. Price and I use methamphetamine but we're not involved in

3   the manufacture.

4        THE COURT:  Let me ask you this on the first

5   consent.  Is it a separate contention of the defendant that the

6   consent should be vitiated solely on the basis of deceit?

7        MR. PATTON:  Well, I can't say that, your Honor,

8   because there is no one factor that controls when you're

9   deciding whether or not --

10        THE COURT:  It's a factor?

11        MR. PATTON:  Correct, it is a factor.  Schneckloth
                        _____

12   makes very clear that you have to consider the totality of the

13   circumstances in deciding whether or not consent is voluntary.

14  There isn't any one particular factor that is dispositive one

15  way or the other.  But it is our contention, as explained in

16  our brief, that if there is deception involved in obtaining the

17  consent, that is a factor; and if other factors are relatively

18  borderline as to whether it's voluntary or not voluntary, then

19  I think this is a factor that can cause you to say look, this

20  is a close case as to whether or not the consent is voluntary,

21  this deceit kicks it over the line into the nonvoluntary side

22  of the ledger.

23         THE COURT:  Let's move it inside the door now?

24         MR. PATTON:  Once they're in the bedroom, Agent

25  Schirra testified that he finds the two pipes.  And then he


                              16


1  says he finds in a dresser drawer a white substance.  He was

2  then asked after you find that, what occurs between you and Ms.

3  Fischer.  Agent Schirra's answer was, at that point I believe

4  she asked me to stop searching the house part because we found

5  that stuff and she thought she was going to get in trouble.

6  That is what he said.  And what's critical, judge, is the

7  wording of it, the house part.  Because if you recall, while

8  Trooper Wilson and Agent Schirra were outside the house with

9  Ms. Fischer asking for consent, they were asking for consent to

10  search the house for methamphetamine production items, but they

11  were also asking to search outside the house for a stolen ATV.

12  So they were asking for consent for the house and for outside

13  the house in this other detached garage area to search for the

14  ATV.

15          THE COURT:  Did they find that?

16          MR. PATTON:  The stolen ATV, yes.  So what's

17  critical, you can see what Ms. Fischer is referring to when she

18  tells Agent Schirra I want to you to stop searching the house

19  part.  She's given consent for the house and for outside.  So

20  she's withdrawing the consent for searching the house.  She is

21  not revoking consent to search outside for the ATV.  And the

22  revocation of consent issue wasn't addressed in the initial

23  papers because there was nothing in the discovery provided to

24  us that discussed it.  And so it's telling because Agent

25  Schirra didn't have any reason to be coached on it or prepared


17


1  for it, it's just a very natural what happens next.  In


2  response to what happens next, where Agent Schirra is just

3  going off his memory, okay, what happened.  We found this

4  stuff, she said she wanted me to stop searching the house part

5  because we found this and now I'm in trouble.  I also would

6  submit to you that that ought to play into your consideration

7  when you're deciding the validity of the initial consent.

8  Because what does Agent Schirra say, he's like once she

9  realized that she could get into trouble --

10      THE COURT:  Hold your thought just one second.

11  Hang on a second, I've got to give a message to my law clerk.

12      (Whereupon, a brief recess was taken.)

13      THE COURT:  All right.  Would you be so kind as to

14  restate your position as to why you felt that the scope of the

15  revocation of the consent was broader than interpreted by the

16  government?

17      MR. PATTON:  Sure.  Agent Schirra and Trooper Wilson

18  both testified that when they were speaking with Ms. Fischer

19  outside in front of the house initially trying to obtain

20  consent to search, they were trying to get consent to search

21  both the inside of the house for methamphetamine production

22  related materials, but they were also asking for permission to

23  search outside the house to look for a stolen ATV.  So they

24  were asking for consent to search inside the house and they

25  were asking for consent to search the outside grounds and

18

1  curtilage of the house.  So when Agent Schirra testified at the

2  hearing that I believe she asked me to stop searching the house

3  part, what that is referring to is Ms. Fischer understanding

4  that she's given consent to search the house for one set of

5  materials, and she's also given consent to search the outside

6  of the house, the curtilage, for the stolen ATV.  And so when

7  she's saying I want you to stop searching the house part, that

8  is revoking the consent she gave to search the house for

9  methamphetamine production materials.  It could not be said

10  that she was revoking consent for the search outside of the

11  house that she had given, if you find that original consent was

12  valid, she was not revoking the consent to search outside of

13  the house.  And that is why and, in particular the way Agent

14  Schirra explained it makes perfect sense in light of the manner

15  in which the consent was obtained from Ms. Fischer and the fact

16  that it was consent not only to search inside the house, but

17  also consent to search outside on the curtilage of the house.

18          THE COURT:  But assume that the revocation was

19   objectively less than that and now move on to the basement?

20          MR. PATTON:  I'm not sure I understand what you mean

21   when you say --

22          THE COURT:  Well, if it was a flat out -- if it was

23   objectively reasonable for him to have concluded that she was

24   essentially saying get out of the house and including the

25   basement, then that's the end of the inquiry?


                            19


1           MR. PATTON:  Correct.

2           THE COURT:  My second point is, assume for the sake

3    of discussion that it was objectively reasonable for him to

4    conclude that the revocation meant house part and not basement,

5    run your argument from there?

6           MR. PATTON:  Well, I would first argue that the

7    basement is part of the house.  And I must say I mean if the

8    court wants to make a finding of fact and law that the basement

9    of a house is not part of the house, I'll feel pretty

10   comfortable talking to the Third Circuit about that.  Because I

11   just don't see under any set of circumstances --

file:///A|/PRICE5-4.TXT

12          THE COURT:  I think I just had a shell lobbed across

13   my bow.

14          MR. PATTON:  Yes.  Look, if you live in a house that

15   has a basement, the basement is part of the house.  I put this

16   hypothetical to you.  If someone had come to that house on Page

17   Road and broken into the basement, that person would have been

18   charged with residential burglary, because the basement is part

19   of the residence.  And it is just common understanding that a

20   basement is part of a house.  Whether you can access the

21   basement from inside the house or not.

22          THE COURT:  Didn't she give a new consent?

23          MR. PATTON:  She did not.  What happened was that

24   she revoked the consent she gave, and then interestingly

25   enough, Schirra didn't keep looking around inside the house, he


                                20


1   left, he went outside.  Which I think is a pretty good

2   indication that he understood that she just revoked her consent

3   to search.  Once she has revoked consent to search the house,

4   if the agents come back to her and are saying well, now we

5   still want to search, we want to search this area, gee, will

6  you give us permission to search the area, even if you agree to

7  that, that's not a free and valid consent, that is simply a

8  submission to government authority.  She's already revoked her

9  consent.  They asked for consent, she revoked her consent, and

10  now they're coming back at her and saying well, we want to

11  search this.  That is not, you're not starting at point zero

12  from there.  All that is Ms. Fischer is saying, look, if you're

13  going to search, you're going to search.  And it's a submission

14  to government authority.  And they've already made it clear,

15  she's already told them I'm revoking my consent, now they're

16  coming back at her trying to get another consent for the same

17  area that she just revoked consent for.  And so to the extent

18  that any consent was given, it was not free and voluntary under

19  those circumstances where you have, even if you find consent

20  was originally given, if consent was then revoked and the

21  government says well, okay, but we really, really want to

22  search this, so give us permission to search the area that you

23  just revoked your consent with respect to, that is not a

24  consent given in response to that situation, it's not free and

25  voluntary.

1          THE COURT:  What's left of the warrant, then, I mean

2    Mr. Trabold takes the position that -- that affidavit in

3    support of the probable cause, absent tainted information,

4    still contains sufficient information to support probable

5    cause?

6          MR. PATTON:  Two responses to that.  First, just

7    factually I think that's just wrong.  The warrant --

8          THE COURT:  Do you have the warrant?

9          MR. PATTON:  I have it in front of me.  After the

10   warrant gives the standard I'm a law enforcement officer, I've

11   investigated methamphetamine, then the affidavit in support of

12   the warrant states that on April 5th of 2002, so you're talking

13   we're on October 5, 2004, at the date this affidavit is being

14   written and presented to Judge Baxter, it says on April 5th of

15   2002, Mr. Price sold, allegedly sold Agent Schirra

16   methamphetamine.  So this is two years, over two years in the

17   past.  The affidavit then says that Mr. Price had been arrested

18   on Marchmont Road in Erie County.  And upon his arrest, he was

19   found to be in possession of items indicative of

20   methamphetamine trafficking, including plastic baggies with

21  methamphetamine residue and pH papers used to gauge the acidity

22  of the methamphetamine production process.

23          THE COURT:  Were those found in his coat?

24          MR. PATTON:  It's not clear where those were found.

25          THE COURT:  Do they say anything about the sodium

22

1  hypophosphite that was in his coat?

2          MR. PATTON:  They do not refer to sodium

3  hypophosphite that was found in the coat.

4          THE COURT:  Just hypothetically, then, you move to

5  suppress the sodium hypophosphite in the coat, and if I

6  suppress that, is that kind of like an academic victory in

7  sound and fury signifying nothing in terms of -- where does

8  that get you?  I'm not saying you may not be entitled to have

9  that suppressed, but it never found its way into the affidavit,

10  so how does it go into the equation?

11          MR. PATTON:  Because if you would find that it was

12  found -- one of the charges against Mr. Price is possessing

13  sodium hypophosphite, a list I chemical --

14          THE COURT:  There was a separate charge of

15    possession of that.  All right, I understand.

16         MR. PATTON:  The affidavit states that after Mr.

17    Price was arrested at Marchmont Road, Schirra went to Price's

18    residence at 8350 Page Road in Wattsburg.  And that it talks

19    about getting consent to search.  Then it says that Ms. Fischer

20    consented and that Agent Schirra and Ms. Fischer went into the

21    bedroom and that several glass pipes with residue that your

22    affiant knows from experience are used to ingest controlled

23    substances were found.  Everything after that point is all the

24    stuff from the basement.  So the only evidence that they had to

25    support a search of the house for a methamphetamine lab --


                                23


1          THE COURT:  Would the pipes themselves, though,

2     support a possession charge; because one of the charges was

3     just possession, right?

4          MR. PATTON:  No.  The warrant said that there was

5     probable cause to believe that Mr. Price was manufacturing

6     methamphetamine at his house.  And they wanted permission to

7     search the house for evidence of methamphetamine production.

8          THE COURT:  I think you're right.  The focus was on

9    meth production relative to the warrant?

10        MR. PATTON:  Correct.  So there's basically three

11    things that would remain in the warrant.  That two-and-a-half

12    years ago Mr. Price allegedly had sold methamphetamine to Agent

13    Schirra.  Which doesn't say anything about Mr. Price

14    manufacturing methamphetamine.  There's information that when

15    Mr. Price was arrested at the Marchmont Road garage, he had

16    plastic baggies and pH paper on him at that location.  Then at

17    this completely separate location, the house, there were found

18    a couple of pipes that can be used to ingest methamphetamine.

19    I would submit to you that that evidence is not sufficient to

20    support a search warrant for the Page Road address for evidence

21    regarding the manufacturing of methamphetamine.  What they

22    asked to search for was -- they were looking for a meth lab is

23    what they were talking about, what they were looking for.  And,

24    again, the sodium hypophosphite, neither the sodium

25    hypophosphite from the Marchmont Road garage, nor the sodium


24


1    hypophosphite allegedly found in the bedroom are mentioned

2    anywhere in the warrant.

3          THE COURT:  But those did form the basis of a

4    separate possession charge -- is that right, Mr. Trabold?

5          MR. TRABOLD:  No, the possession charge in the

6    indictment is related to, it can include the sodium

7    hypophosphite found during any arrest of him.  But the sodium

8    hypophosphite principally includes the sodium hypophosphite

9    found in the basement.

10          THE COURT:  All right.

11          MR. PATTON:  So factually I would submit to you that

12    there would not have been enough evidence in the affidavit to

13    support the issuance of a search warrant.  Legally I would

14    argue to you, as we argued in our brief, that you cannot use

15    the inevitable discovery doctrine to justify a warrantless

16    search that violated the Fourth Amendment.  It cannot later be

17    justified by saying well, we could have went and got a warrant

18    if we wanted to and, therefore, we would have inevitably

19    discovered this evidence.  Because then you're making the

20    warrant requirement meaningless.

21          THE COURT:  You're preaching to the choir on that

22    point.

23          MR. PATTON:  I would like to back up, your Honor, on

24    whether or not Ms. Fischer had authority to --

25        THE COURT:  To go into the basement?


25


1        MR. PATTON:  Yes, consent to a search of the

2   basement, either actual or apparent, to the extent that that's

3   going to play a role in the court's decision.  The entire basis

4   for third-party consent is the belief that if two people

5   mutually use property and have mutual access to it, they each

6   assume the risk that the other may let somebody else into that

7   area.  That is the rationale for third-party consent laid out

8   by the Supreme Court in United_States_v._Matlock.
       ⎯⎯⎯ ⎯⎯⎯ ⎯ ⎯⎯⎯

9        THE COURT:  Didn't the Supreme Court just decide a

10  case on that or was that --

11       MR. PATTON:  The Supreme Court in a case called

12  Georgia_v._Randolph, just dealt with the consent issue.  Now,
    ⎯⎯⎯ ⎯ ⎯⎯⎯

13  in that case Mr. Randolph was home, Mrs. Randolph was home,

14  they were estranged.  Mrs. Randolph had been out of the house,

15  they were separated, but Mrs. Randolph was back at the house.

16  The police come to the house.  Mrs. Randolph is saying hey,

17  he's got some cocaine and some stuff upstairs, it's okay with

18  me if you search.  Mr. Randolph is standing there at the

19  same time saying hey, I'm not giving you permission to search.

20  And the Supreme Court found that Mrs. Randolph's consent to

21  search could not trump Mr. Randolph's consent to search.

22       THE COURT:  It wasn't an apparent authority case?

23       MR. PATTON:  No.  There was a passage in Randolph I
                                              _____

24  think that is appropriate.  The Supreme Court said that Matlock
                                                            _____

25  relied on what was usual and placed no burden on the police to


                                26


1  eliminate the possibility of atypical arrangements.  In the

2  absence of reason to doubt that the regular scheme was in

3  place.  So police officers can presume that if a couple are

4  married or co-habitating, it is not unreasonable for police

5  officers to assume that each person has equal access to all

6  parts of the residence.  But if the police officers learn

7  information that indicates to them that what is usual is not in

8  fact the case here, they cannot ignore that evidence and turn a

9  blind eye to it.  So that if a couple, and it doesn't even have

10  to be couple, there is a case of a mother and a son.  Mom had

11   access to son's bedroom but didn't have a key to the footlocker

12   that the son kept in his room.  In that case the Fourth Circuit

13   said look, the mother has access to the room, so she can let

14   the police officers into the room, but she doesn't have access

15   to that footlocker.  The son hasn't assumed the risk that the

16   mom will let someone look in the footlocker.  And so mom can't

17   give consent.  And the Fourth Circuit in another case that's

18   somewhat different, it was a computer, that two people equally

19   used the computer.  But they each kept their files separate

20   from one another and had passwords protecting their files, that

21   the other did not know.  The Fourth Circuit said look, neither

22   party has assumed the risk that the other person will have

23   access to their files because they kept them separate and they

24   password protected them.  Which is the same as keeping them

25   locked.


27


1        THE COURT:  How does those principles play out here?

2        MR. PATTON:  The way that those principles play out

3   here is the situation that Schirra and Wilson are presented

4   with is Ms. Fischer saying well, I don't have a key to this,

5   Johnny has the key.  And that her access to the basement is

6   only through Mr. Price.  So yes, she has access to the basement

7   if Mr. Price allows her into the basement.  But if he is gone

8   and has the key, she doesn't have access.  And so there is no

9   way that this court can say that Mr. Price assumed the risk

10  that Ms. Fischer might permit the basement to be searched

11  because Mr. Price, with Ms. Fischer's consent, this was just

12  the arrangement they reached, was that that area was locked and

13  only he had access.

14         THE COURT:  That was an outside man door, wasn't it,

15  and he didn't lock it, anybody could go down into the basement,

16  is that right?

17         MR. PATTON:  True.  Anybody, including Ms. Fischer.

18  The bottom line, judge, two people can create their living

19  arrangements however they want.  And if the police know of

20  those living arrangements or reasonably ought to know those

21  living arrangements, they have to honor it.  There wasn't any

22  apparent authority because she's saying well, if you can defeat

23  the lock that's on the door, you can search.  No reasonable

24  person should accept that as a valid consent to search.  Saying

25  hey, I don't have a key to get into this area, so I can't get

1   into it myself, but if you can beat the lock, be my guest and

2   search, that's not apparent authority.

3        THE COURT:  All right, thank you.  Do you have

4   anything briefly there, Mr. Trabold?

5        MR. TRABOLD:  I do, your Honor.  On this last point

6   if I could just address it.  The record is not, does not in any

7   way, shape or form indicate that Ms. Fischer said she only had

8   access to the basement when Johnny or Mr. Price let her in.

9   That's not what the record indicates on pages 40 through 42.

10  Despite counsel's withering cross-examination to try and get

11  the agent to indicate that, the agent at no time indicates that

12  Ms. Fischer said she only had access to the basement if Mr.

13  Price let her in.  In fact, the bear facts of the record

14  completely contradict that unless the court was to conclude

15  that every time she did laundry she had to seek Mr. Price out

16  in order to let her into the basement.  So the record does not

17  indicate that she did not have apparent authority.  However,

18  what may be the most important point of this case because it

19  can be case dispositive, separate and apart from whatever else

20  you decide, the search warrant does not indicate that the

21  officers were only seeking evidence of a methamphetamine lab.

22  It indicates very clearly the following:

23          "Wherefore, based upon the foregoing, I have

24  probable cause to believe that located at the property and

25  premises known as 8350 Page Road, Wattsburg, Venango Township,


                                29


1  Erie County, on which is located a single-family one-story

2  range-style residence," and then it indicates there is

3  presently the following evidence:

4          "(1).  Methamphetamine and any other illegal

5  controlled substance, any and all devices used to store,

6  manufacture and/or ingest methamphetamine or any controlled

7  substance."

8          And then it goes on to indicate a variety of other

9  items, ten paragraphs of items that the officers are seeking to

10  find in the residence, and that they believe they have probable

11  cause to find, or that will be located there.  So the warrant

12  does not indicate that the officers believe they have probable

13  cause and are only seeking a methamphetamine production lab.

14  The warrant indicates the officers, by what they've laid out,

15  believe they have probable cause to believe that located in the

16  residence will be just the bear controlled substances, as well

17  as materials that may be used to ingest those controlled

18  substances.  Separate and apart from any manufacturing process

19  or packaging up facility or anything like that.  From this

20  warrant there can be no question that there is probable cause

21  to conclude, if you take out the tainted evidence, that Mr.

22  Price has items in his home used to ingest controlled

23  substances.

24        THE COURT:  Namely the two pipes?

25        MR. TRABOLD:  Namely the two pipes.  The pipes


30


1  aren't the only evidence that is indicative of that because the

2  warrant plainly indicates that when Mr. Price is arrested, he

3  has items, without any mention of sodium hypophosphite, he has

4  items indicative of methamphetamine distribution.  And the

5  warrant indicates that quite clearly.  It indicates -- this is

6  at paragraph six of the warrant.  "Upon his arrest, Price was

7  found to be in possession of items indicative of

8   methamphetamine trafficking, including plastic baggies with

9   methamphetamine residue and pH papers used to gauge the acidity

10  of the methamphetamine production process."  So at a minimum in

11  this case what you have when you've removed the tainted

12  evidence, is a warrant which seeks to enter somebody's home for

13  evidence of just plain controlled substances and/or items to

14  used to ingest them and in support of that says we had an

15  arrest warrant for this individual for distributing controlled

16  substances to the affiant listed in the warrant.

17          THE COURT:  Is it illegal to have, if all you have

18  are pipes, are those illegal?

19          MR. TRABOLD:  Yes, in Pennsylvania that's the

20  possession of drug paraphernalia.  So the warrant indicates we

21  arrested this individual who we had a warrant on for

22  distributing methamphetamine to the affiant.  When we arrested

23  him, he had these items indicative of methamphetamine

24  trafficking.  When we went to his house, we found pipes which

25  your affiant through his experience knows are used to ingest

31

1   controlled substances.

2          THE COURT:  Are you saying that two pipes alone, if

3    that's all there was, would have supported a search of the

4    premises?

5          MR. TRABOLD:  Without question.  Because they say

6    right in here that one of the things they're searching for is

7    controlled substances and/or items used to ingest controlled

8    substances.  Those are two of the items they were seeking to

9    find in this search warrant.  When you find drug paraphernalia

10   in somebody's house, that in and of itself gives you enough to

11   search their house for those types of items.

12          So separate and apart from any consent, the warrant

13   contains sufficient evidence, even if you remove all of the

14   items that are arguably tainted, to search Mr. Price's house.

15          Just a couple other points, and I know we've got

16   briefs and we have belabored it.  Counsel says it's obvious

17   that Agent Schirra knew that the consent had been revoked

18   because he immediately left the house.  Well, that is a gross

19   distortion of the record.  Because the record indicates that

20   Agent Schirra, upon the limitation of consent asked Ms. Fischer

21   where's the basement.  She then took him, she led him outside

22   the house and then to the basement man door.  To say that he

23   left the house because he knew that she had basically kicked

24  him out of the house is plainly distorting the record.

25      This is not so cut and dry of a situation with

32

1  regard to the basement being in the house and this type of

2  thing, for several reasons.  First of all, what Agent Schirra

3  says is she told me she didn't want me to search the house

4  part.  And then when counsel cross-examines him further, he

5  specifically says she told me she didn't want me to search the

6  house part upstairs.  And counsel wants you to basically decide

7  this case on only the portion of the factual record in this

8  case that supports his argument.  You have to look at the

9  entirety of the record in this case.

10      THE COURT:  It's a single-family dwelling, it's a

11  one-level house, right, it wasn't a two-story?

12      MR. TRABOLD:  Well, it's a single-family dwelling,

13  but you have to go downstairs and around to get to the

14  basement.  So to say that it is cut and dry and he'd love to

15  take this case in front of the Third Circuit, well, that may be

16  the case, but the record is what the record is.  You can't

17  argue for suppression and then attempt to limit the focus of

18   what an agent said solely to that portion of the record that

19   benefits you.

20        THE COURT:  It's your view that it is objectively

21   reasonable to view the house part as the house itself but not

22   the basement?

23        MR. TRABOLD:  But not the basement.  Precisely

24   because you can't access the basement from the house, the

25   basement is below the house.  What we cannot get away from is


33


1   what the agent testified to, and with no other evidence to the

2   contrary of what was actually said by Ms. Fischer.  So you

3   can't just look at it and say well, this is what is included

4   here, therefore, we're going to ignore what the agent actually

5   said and we're going to try to parse out and limit what we want

6   the court's focus to be.

7        THE COURT:  All right.

8        MR. TRABOLD:  The only other point I want to raise

9   is, again, this is not the usual situation where the basement

10   is so clearly part of the house.  Because you have a basement

11   where you can't access it from inside the house.

12          THE COURT:  Did he know that -- does the record

13    reflect one way or the other what he knew about the

14    configuration of the property insofar as it relates to how you

15    would get into the basement?

16          MR. TRABOLD:  I don't think the record indicates

17    that prior to going there they necessarily had knowledge that

18    you can't access the basement from inside the garage.  Just

19    finally, there is no evidence in this record that should cause

20    the court to conclude that the agents, even in the slightest

21    regard, tried to overcome or overbear Ms. Fischer's will with

22    regard to the consent to search the basement.  I argue in the

23    brief and I think it's extremely valid, if anything, they're

24    honoring of her limitation of the first consent should have

25    made it very, very clear to her that she was the one running

34

1    the show.  Whatever she said went.  She didn't have to merely

2    acquiesce to their authority.  And the claim that they made a

3    claim to lawful authority, all of those cases in that area

4    surround the general proposition of an agent saying well, we're

5    just going to get a search warrant and really if you don't

6   consent, it's really of no consequence.  There is nothing in

7   the record that indicates that that's what happened here.

8   Thank you.

9          THE COURT:  I just have one last question for you

10  there, Mr. Patton, if you could come on up here maybe it's

11  easier to be heard.  What about Mr. Trabold's point where he's

12  reading from the preamble to the affidavit that it would be --

13  that it is broad enough to subsume not only a search looking

14  for a meth lab, if you will, but a search simply looking for

15  drug paraphernalia?

16         MR. PATTON:  Well, that doesn't justify -- even if

17  you would find they could have got a warrant to search just

18  for --

19         THE COURT:  Pipes or whatever?

20         MR. PATTON:  For pipes or whatever, that doesn't

21  vitiate the illegal search that led to what was found in the

22  basement.  And it goes back, judge, to the legal argument that

23  even if you believe they could have gotten a warrant to search

24  the house, based on the information that they had, any time

25  prior to the illegal search, that fact cannot post hoc be used

1   to save evidence that was found during an illegal search.  If

2   you let them do that, you are saying any time you have probable

3   cause to get a search warrant, you don't have to get the search

4   warrant because you can search without the warrant in violation

5   of the Fourth Amendment, and then simply go to court and say

6   well, judge, so what, we violated the Fourth Amendment rights,

7   all we would have had to do was go and get a warrant, and we

8   could have then searched and found this stuff.  So no harm no

9   foul.

10       THE COURT:  If you take out all the other stuff

11   beyond the two pipes as being tainted, couldn't the cops have

12   searched the entire place, including the basement, for pipes?

13       MR. PATTON:  Not with the same intensity that they

14   searched for.  The scope of the search is limited to what you

15   are searching for.  And I don't believe that it is at all

16   reasonable to believe that if you're looking for evidence that

17   there is drug paraphernalia in the house and all you're looking

18   for is drug paraphernalia, that is stuff that's used to

19   actually ingest drugs, that you are going to go through the

20   basement of a house looking through closed garbage bags and the

21  like, what Trooper Wilson and Agent Schirra claim that they

22  intentionally looked through in the basement.

23          THE COURT:  Do one of you have the affidavit handy?

24          MR. PATTON:  Yes.  And it's part of the record.

25          THE COURT:  It's part of the record, but just for my

36

1  convenience.  I'll tell you what I'm going to do.  I wasn't

2  sure when I came out here this morning whether I was going to

3  rule on the record or not, and I'm not sure.  I want to go talk

4  to my law clerk for a few minutes.  And I'm going to either

5  come out and tell you that I don't think I can rule on the

6  record or I'm going to tell you that I'm going to rule on the

7  record, but I don't know which.

8          MR. PATTON:  Your Honor, there's a picture of the

9  house with the warrant.

10          THE COURT:  Is that part of the affidavit?

11          MR. PATTON:  Yes.

12          THE COURT:  All right, I'll take a look at that.

13  We're in recess.

14          (Recess taken from 11:28 p.m.; until 1:30 p.m.)

15    THE COURT:  All right, I am going to give you an

16  opinion.  This is going to be an order.

17              ORDER

18        Defendant moves to suppress the fruits of a

19  warrantless search conducted on October 5, 2004.  As a result

20  of the discovery of materials connected with methamphetamine

21  production, the agents obtained a search warrant, the execution

22  of which resulted in the seizure of chemicals used to

23  manufacture meth.  Defendant argues, in essence, that the

24  consent to search given by the defendant's girlfriend,

25  Ms. Fischer, was not voluntary.  See Schneckloth_v._Bustamonte,
                  _____ __ _____


                         37


1  412 U.S. 18, 248-49 (1973).

2        Defendant also moves to suppress a bag containing

3  sodium hypophosphite found in the defendant's jacket at an auto

4  garage on October 5, 2004.  With respect to this seizure,

5  defendant argues that it runs afoul of the teaching of

6  United_States_v._Myers, 308 F.3d 251 (3rd Cir. 2002), in that
    _____ _____ __ _____

7  the defendant was not in proximity to his jacket and had been

8  handcuffed at the time of the search of his jacket.

9      First, based on the testimony and exhibits received

10  at the hearing, I set forth in narrative form my findings of

11  fact, as well as conclusions of law.

12      Subsequent to arresting the defendant, the

13  circumstances of which will be described more fully later,

14  Agent Schirra, Trooper Wilson and Agent Albeck proceeded to the

15  defendant's residence.  They were met at the door by a

16  14-year-old girl and a 9-year-old boy, the defendant's

17  children.

18      Let me just clear something up right now so we don't

19  have a problem where there's not an issue on appeal.  Whose

20  natural children were these, does the record reflect; do you

21  know, Mr. Trabold?

22      MR. TRABOLD:  I think the record reflects that

23  they're Mr. Price's children.

24      MR. PATTON:  Your Honor, both children are the

25  natural children of Mr. Price; the young boy is the child of

38

1  Ms. Fischer with Mr. Price.

2          THE COURT:  Let me just say this -- we're back on

3    the opinion.  When the police officers went to the door, they

4    were met at the door by a 14-year-old girl and a 9-year-old

5    boy.  As Ms. Fischer was not home and Mr. Price was under

6    arrest, they called Ms. Fischer, after obtaining her work phone

7    number, and they told her to come home.  In route she

8    apparently ran out of gas in close proximity to the house,

9    which required one of the officers to go and pick her up at the

10   end of the road and bring her back to the house, which he did.

11   When she arrived, it was explained to her that Mr. Price was

12   under arrest for a previous delivery of methamphetamine, and

13   she was further advised that they had information that he was

14   involved in the manufacturing of methamphetamine at the house,

15   and Agent Schirra informed her that they wanted to make it safe

16   for the children.  Agent Schirra asked for her consent to

17   search the house and she provided verbal consent.  The officers

18   at the time of the conversation concerning the search of the

19   house did not have their guns drawn.  She was not verbally or

20   physically threatened.  Only one of the officers was with Agent

21   Schirra when he obtained consent.  I find that the atmosphere

22   surrounding the encounter was not hostile, and as previously

23   indicated, one of the officers had driven her to the residence

24  after her car problem.

25        I also note she was an adult apparently of average


39


1  intelligence, who had previous experience with the criminal

2  justice system by virtue of a prior criminal record.  Although

3  she was not advised of her right to refuse consent, as will be

4  discussed more fully below, her subsequent revocation of

5  consent indicates her awareness of that right.

6        I finally note that Ms. Fischer was not in custody

7  when she consented to the officers' search of the residence.

8        As stated in United_States_v._Kim, 27 F.3d 947

9  (3rd Cir. 1994):

10        "As the Supreme Court instructed, when a prosecutor

11  seeks to rely upon consent to justify the lawfulness of a

12  search, he has the burden of proving that the consent was, in

13  fact, freely and voluntarily given."  Schneckloth, 412 U.S. at

14  222.  "Whether a consent to a search was in fact 'voluntarily'

15  or was the product of duress or coercion, express or implied,

16  is a question of fact to be determined from the totality of all

17  the circumstances." Id. at 227.  "Thus whether consent was
                —

18  given is to be resolved by examining all relevant factors,

19  without giving dispositive effect to any single criterion.

20  Certain factors that courts consider in determining whether

21  confessions were voluntary, such as the age of the accused, his

22  education, his intelligence, whether he was advised of his

23  constitutional rights, and whether the questioning was repeated

24  and prolonged are relevant to our examination."  That's at page

25  955.


                                40


1           Here, applying this legal standard to the facts that

2   I have set forth more fully above, I find that the initial

3   consent to search the house was voluntary.

4           Returning to the factual narrative.  After the

5   consent was given, Agent Schirra followed Ms. Fischer into the

6   house, while Trooper Wilson stayed outside.  She unlocked the

7   bedroom door voluntarily and informed Agent Schirra that they

8   do use methamphetamine and there might be some "pipes" in

9   there.  The record reflects that while searching the bedroom

10   shared by Price and Ms. Fischer, Agent Schirra found a couple

11   of glass pipes, as well as a bag containing a white crystal

12   substance, which Agent Schirra believed to be sodium

13   hypophosphite, a chemical precursor to methamphetamine.

14   Upon discovering these items, Agent Schirra indicated to

15   Ms. Fischer that this evidence was consistent with the

16   manufacturing of methamphetamine and that there was sufficient

17   probable cause to charge her with that offense.  Agent Schirra

18   testified that "at that point -- I believe she asked me to stop

19   searching the house part.  Because we found that stuff and she

20   thought she was going to get into trouble." (Transcript at 13.)

21   Price argues that this exchange reflected an intent by her to

22   revoke in its entirety any prior consent to search.  The

23   government agrees that Ms. Fischer manifested an intent to

24   revoke her consent, but it claims that the revocation was only

25   partial and therefore did not affect Agent Schirra's subsequent


41


1   search of the basement area.

2        It is well recognized that a person consenting to a

3   search may limit the scope of that search or even retract it

4  all together.  See Florida_v._Jimeno, 500 U.S. 248, 252 (1991);
        ‾‾‾‾‾‾‾ ‾‾ ‾‾‾‾‾‾‾

5  Painter_v._Robertson, 185 F.3d 557, 567 (6th Cir. 1999).
   ‾‾‾‾‾‾‾‾ ‾‾ ‾‾‾‾‾‾‾‾‾‾

6  See also Kim, "when an official search is properly
         ‾‾‾

7  authorized -- whether by consent or by the issuance of a valid

8  warrant -- the scope of the search is limited by the terms of

9  its authorization."  Quoting Walter_v._United_States, 447 U.S.
                              ‾‾‾‾‾‾ ‾‾ ‾‾‾‾‾‾ ‾‾‾‾‾‾

10  649, 656 (1980).  Once consent is revoked, the police may not

11  thereafter continue to search in reliance upon the earlier

12  consent.  United_States_v._Lattimore, 87 F.3d 647, 651,
           ‾‾‾‾‾‾ ‾‾‾‾‾‾ ‾‾ ‾‾‾‾‾‾‾‾‾

13  (4th Cir. 1996).

14        Here, the parties dispute as to whether Ms. Fischer

15  partially or completely revoked any consent previously given

16  for the search is borne of an ambiguity in Agent Schirra's

17  testimony.  He initially testified that, subsequent to his

18  discovery of the glass pipes and suspected sodium hypophosphite

19  in the bedroom, Ms. Fischer asked him to stop searching "the

20  house part."  (Transcript at 13).  However, upon further

21  examination by this court, Agent Schirra somewhat refined his

22  testimony, stating that Ms. Fischer had actually indicated she

23  didn't want him searching "the bedroom anymore.  She didn't

24  want me going through any more drawers in the bedroom."

25  (Transcript at 21).


42


1         Defense counsel subsequently tried to flesh out this

2  ambiguity:

3         "Q.   So you start looking through the dresser

4  drawers, you find what you believe to be sodium hypophosphite?

5         "A.   Correct.

6         "Q.   At that point Ms. Fischer says I want you to

7  stop searching?

8         "A.   Searching the drawers, yes, she didn't want

9  me going through any more dressers.

10         "Q.   Well, here's the confusing thing for me,

11  Agent Schirra.  On direct the first time you were asked about

12  this, you stated she told us she didn't want us to look in the

13  house anymore.  When Mr. Trabold asked you about it the first

14  time, that was your response.  How did you go from she told us

15  she didn't want us looking in the house anymore to, well, no,

16  she just told us that she didn't want us searching any dressers

17  in the bedroom?

18      "A.   Then I misspoke with Mr. Trabold.  She did

19  not want me going through any more dressers in that bedroom.

20      "Q.   She didn't say I just don't want you looking

21  around in the drawers of my house anymore, she said I don't

22  want you looking in the house anymore?

23      "A.   No, she actually said I don't want you going

24  through any more drawers.

25      "Q.   But after you find the sodium hypophosphite,


43


1  she realized she's in trouble and you tell her that she's in

2  trouble, she told you to stop looking, correct?

3      "A.   Correct, upstairs.

4      "Q.   She didn't want you looking in the house,

5  correct

6      "A.   Upstairs, yes."

7          Price contends that Ms. Fischer's words to Agent

8  Schirra reflected an unequivocal intent to revoke her previous

9  consent and thereby preclude any further search of the entire

10  residence, including the basement area which, Price contends,

11  is "obviously part of the house."  (Defendant's brief at page 7

12  and Transcript at 42.)  We do not agree that such a finding is

13  mandated on the record.

14          "The standard for measuring the scope of a suspect's

15  consent under the Fourth Amendment is that of 'objective'

16  reasonableness, what would the typical reasonable person have

17  understood by the exchange between the officers and the

18  suspect?"  Kim, 27 F.3d at 956.  Here, the uncontradicted

19  testimony from Agent Schirra shows that, at most, Ms. Fischer

20  articulated an intent to preclude further searching of "the

21  house part" of the residence.  Agent Schirra interpreted that

22  to mean the upstairs living quarters of the home, and upon Ms.

23  Fischer's request, Agent Schirra immediately stopped searching

24  that portion of the residence.  We note that the residence in

25  question is a single-family ranch-style home with a basement

44

1  area that is distinct from the upstairs living area.  Thus, we

2  find Agent Schirra's interpretation of Ms. Fischer's request to

3  stop searching "the house part" to be objectively reasonable

4  and consistent with what a typical, reasonable person might

5    have understood given the context of the exchange.

6           Nevertheless, even if we were to find that Ms.

7    Fischer did revoke her original consent in its entirety, we

8    nevertheless conclude that she gave the agents a second valid

9    consent to search the basement.  The evidence shows that upon

10   ceasing his search of the interior living quarters, Agent

11   Schirra inquired how the basement area is accessed.  Ms.

12   Fischer indicated that the basement could only be accessed from

13   outside of the house.  She then led Agent Schirra to an area on

14   the side of the house where there was a garage door and a man

15   door.  Agent Schirra tried the man door and discovered it was

16   locked.  Agent Schirra, who by now was joined by Trooper

17   Wilson, inquired whether Ms. Fischer had a key, and she

18   indicated that she did not, that Price had the key.  The agents

19   then asked whether she had ever had access to that area, and

20   she responded affirmatively, stating that was where she does

21   her wash and where she kept Christmas supplies and other

22   declarations that were used throughout the year.

23          Agent Schirra then asked Ms. Fischer if he could

24   have permission to enter and search the basement area.  And Ms.

25   Fischer indicated that if the agents could get in without

45

1   causing damage to the doors, then they could enter the

2   basement.  Trooper Wilson then picked the lock with his knife,

3   and once the doors were opened, Agent Schirra asked for

4   permission to search the basement area.  According to Agent

5   Schirra, Ms. Fischer said "go ahead."  Once inside, Agent

6   Schirra discovered a plethora of contraband.

7          Price contends that Ms. Fischer did not validly

8   consent to a search of the basement because her so-called

9   "consent" was nothing more than a submission to police

10  authority.  See Florida_v._Royer, 460 U.S 491, 509 (1983)
            _____ __ _____

11  (government's burden of proving voluntary consent "is not

12  satisfied by showing a mere submission to a claim of lawful

13  authority.").  Again, we do not agree.

14         As we previously noted, courts judge the validity

15  and voluntariness of a subject's consent under the totality of

16  the circumstances.  This includes, as we previously outlined,

17  numerous factors bearing on the characteristics of the party

18  giving consent and the circumstances under which that consent

19  was given.  Here, Ms. Fischer was a mature, middle-aged woman

20  of apparently at least average intelligence and education.

21  Through her prior criminal history, she had at least some prior

22  experience dealing with law enforcement officers.  The

23  circumstances of the search were relatively low key and

24  untainted by any threats, promises or coercion on the part of

25  law enforcement.  While there were numerous officers called in


46


1  to secure the property, the majority were held off the premises

2  where they could not interfere with the searches or present any

3  unduly intimidating atmosphere.  Agent Albeck remained in his

4  car, while only Agent Schirra and Trooper Wilson dealt directly

5  with Ms. Fischer.  Though the officers were armed, their

6  weapons were not drawn and, in fact, Agent Schirra was in

7  plainclothes in an undercover capacity.  There is no indication

8  from the record that the officers raised their voices or became

9  physically menacing.  At no time was Ms. Fischer touched,

10  handcuffed, or placed in legal custody.  In fact, she was not

11  only free to leave, she was encouraged to take her children to

12  the hospital for medical screening following the conclusion of

13  the search.  The duration of the search does not appear to have

14  lasted for an unduly long period, and at no time were the

15  officers asked to leave the property.

16       The circumstances of Ms. Fischer's second consent

17  demonstrate that it was given voluntarily.  At no time during

18  the second consent did Ms. Fischer articulate or intimate a

19  reluctance to allow the search of the basement.  On the

20  contrary, at Agent Schirra's request, she led him to the

21  basement entrance.  Agent Schirra explicitly asked permission

22  to enter and search that area; and Ms. Fischer gave express, if

23  conditional, consent (i.e., don't break the door).  Neither

24  Agent Schirra nor Trooper Wilson represented that a refusal of

25  consent was futile or that a warrant would be obtained in any

47

1  event.  And although the officers never expressly informed Ms.

2  Fischer of her right to refuse consent, it is clear that she

3  understood that right, as she had previously exercised it

4  during Agent Schirra's search of the bedroom.  While Price

5  contends that Agent Schirra's persistence merely demonstrated

6  that any refusal of consent was futile, we think that his

7  conduct in immediately ceasing a search within the upstairs

8  living quarters, upon her request, demonstrates that Ms.

9  Fischer did have an objective awareness of her right to limit

10  the agents' activities.

11      We recognize that Ms. Fischer ultimately refused to

12  sign a consent form memorializing her voluntary agreement to

13  the search.  However, this is only one factor among many for

14  consideration, and in this case we do not view it as

15  dispositive.  We also recognize that at the time she gave her

16  consent to search the basement, Ms. Fischer was aware that the

17  agents had found incriminating evidence in the bedroom, and

18  that Agent Schirra believed there was probable cause to charge

19  her with manufacturing methamphetamine.  Though we do not

20  minimize this factor in our calculus, there is no indication

21  that the officers pressured or manipulated her with the use of

22  this information.  There is no evidence, for example, to

23  suggest that the officers propagated the idea that, unless Ms.

24  Fischer acquiesced in the search of the basement, her legal

25  position would be worse or her property would be damaged.


48


1      Finally, Price makes much of the fact that the

2    officers supposedly used deceit in representing that their

3    primary interest was to protect Ms. Fischer and her children

4    from imminent physical danger posed by the presence of

5    chemicals on the property.  While the agents were no doubt

6    interested in securing the contraband for purposes of their

7    criminal case, the evidence does not such suggest that they

8    were deceitful in representing concerns for the children's

9    safety.  In fact, Ms. Fischer was specifically encouraged to

10   take her children off the premises for medical evaluation

11   following the discovery of hazardous chemicals in the basement.

12   Moreover, Ms. Fischer could not have been deceived by the

13   officers' failure to spell out the fact that their activities

14   might lead to the filing of criminal charges against Price

15   and/or Ms. Fischer.  It was obvious from the outset that the

16   officers were searching for illegal methamphetamine production

17   and in fact, as previously indicated, so advised her.

18          Finally, Price contends that Ms. Fischer could not

19   have validly consented to the search of the basement because

20   she possessed neither actual nor apparent authority to grant

21   this consent.  Again, we disagree.

22          The Supreme Court has recognized that even if a

file:///A|/PRICE5-4.TXT

23  third party lacks actual authority to consent to a search,

24  there is no Fourth Amendment violation if the police

25  mistakenly, but reasonably believe that the third party has

49

1  authority to consent.  Illinois_v._Rodriguez, 497 U.S. 177,
   _____ __ _____

2  186 (1990).  However, this standard is to be judged objectively

3  rather than subjectively:

4        Even when the invitation is accompanied by an

5  explicit assertion that the person lives there, the surrounding

6  circumstances could conceivably be such that a reasonable

7  person would doubt its truth and not act upon it without

8  further inquiry.  As with other factual determinations bearing

9  upon search and seizure, determination of consent to enter must

10  "be judged against an objective standard:  would the facts

11  available to the officer at the moment, 'warrant a man of

12  reasonable caution in the belief' that the consenting party had

13  authority over the premises?"  Id. at 188.
                           __

14        We think the facts developed by the government

15  fairly establish that a reasonable officer in the position of

16  Agent Schirra would believe that Ms. Fischer had at least

17  apparent authority to permit the officers access to the

18  basement area.  The evidence reflects that Price and Ms.

19  Fischer shared the residence in question with their children

20  and that Price referred to Ms. Fischer as his "wife."

21  (Transcript page 6.)  Nothing about the facts of Agent

22  Schirra's initial interior search of the home suggested that

23  Ms. Fischer's authority over the residence was limited.  Upon

24  arriving at the basement entrance, Agent Schirra discovered the

25  man door was locked and asked Ms. Fischer if she had the key.


50


1  She indicated that she did not have the key and that Price had

2  the key.  Although Ms. Fischer made some mention of Price

3  sometimes letting her into the basement area, it is not clear

4  from Ms. Fischer's statements to Agent Schirra whether Ms.

5  Fischer's exclusive means of access to that area was through

6  Price or whether Ms. Fischer on occasion also had independent

7  access to the basement.  What is clear is that the basement was

8  utilized, at least in part, for laundry and storage purposes,

9  and that Ms. Fischer did have access to the basement to do her

10  laundry and retrieve Christmas supplies and other decorations.

11  We also find it significant that the basement was accessible

12  from the outside of the house and, thus, the fact that it was

13  locked could be consistent merely with a general intent to keep

14  out children or other intruders.  Under these facts, we think

15  the record is sufficient at least to establish that Mr.

16  Fischer's apparent authority to consent to the basement search.

17  In light of this finding, we need not determine whether the

18  record would support a finding of Ms. Fischer's actual

19  authority to permit a search of the basement.

20          In sum we find, for all of the foregoing reasons,

21  that an objectively reasonable officer in Agent Schirra's

22  position would have concluded that Ms. Fischer voluntarily and

23  validly consented to the search of the basement,

24  notwithstanding the partial revocation of her original consent.

25  The government has therefore satisfied its burden of proving

51

1  that the warrantless search of the basement was valid.

2          Alternatively, though, even if the defendant is

3  correct that Ms. Fischer did not give a valid consent to the

4  warrantless search of the basement area, and thus assuming that

5  the contraband found in the basement area should not have been

6  included in the affidavit in support of the search warrant, we

7  nevertheless conclude that the warrant was independently

8  supportable by other information contained therein.

9  See United_States_v._Herrold, 962 F.2d 1131, 1138 (3rd Cir.)
   _____ _____ __ _____

10  We note that the search warrant covered not only evidence

11  pertaining to methamphetamine production, but also evidence

12  consisting of methamphetamine itself and any other illegal

13  controlled substance, as well as evidence pertaining to the

14  purchasing, transportation, maintenance, storage, distribution

15  and/or ingestion of methamphetamine.  Even if all references to

16  the contraband found in the defendant's basement had been

17  excised from the search warrant affidavit, the affidavit still

18  includes information that:  (1) the defendant had sold a

19  quantity of methamphetamine to Agent Schirra in April of 2002,

20  for which he was arrested on October 5, 2004, after eluding law

21  enforcement authorities for approximately two-and-a-half years;

22  (2) upon his arrest, the defendant was found to be in

23  possession of items indicative of methamphetamine trafficking,

24  including plastic baggies with methamphetamine residue and pH

25  papers; (3) evidence was found within the defendant's residence

52

1    on October 5th that was consistent with the ingestion of

2    controlled substances, namely, several glass pipes with residue

3    which were found within a locked master bedroom.  Agent

4    Schirra's affidavit further explains, based on his professional

5    experience and expertise, that persons engaged in the

6    distribution of methamphetamine often maintain various types of

7    documentation reflecting the acquisition, transportation, and

8    distribution of controlled substances, as well as proceeds and

9    expenditures of and for those activities, and they are known to

10   conceal in their residences and businesses caches of drugs,

11   large amounts of currency, financial instruments and other

12   tangible property, precious metals, jewelry, firearms and other

13   items of value, proceeds of drug transactions and evidence of

14   financial transactions, all of which are often secreted in

15   hidden compartments or buried underground or hidden in

16   vehicles.  Thus, even if all references to the contraband found

17   in the basement area were excised from the affidavit, the court

18   finds that the affidavit would still support a broad search of

19  the premises for the evidence outlined in the warrant insofar

20  as it pertains to methamphetamine itself or other controlled

21  substances, and/or the storage, purchase, transportation,

22  distribution or ingestion of methamphetamine.

23         I now turn to the separate issue of the legality of

24  the search of the defendant's coat.  The facts driving my

25  analysis of this search are as follows.  Agent Schirra had


53


1  information that the defendant was running a car garage on

2  Marchmont Road.  He had an arrest warrant for Mr. Price based

3  upon a prior delivery of methamphetamine approximately two

4  years before.  Agent Schirra and five other agents went to the

5  garage to arrest Mr. Price.  One of the large overhead doors

6  was open and they entered through it.  They observed Mr. Price

7  was the only one present and they found him in an office area.

8  He at this point was immediately handcuffed and removed from

9  the garage.  After this was accomplished, one of the agents

10  observed a firearm magazine in plain view in the back of a

11  backpack believed to belong to one of Price's confederates.

12  Mr. Price's coat, which was lying next to the backpack, was

13  searched and a bag containing sodium hypophosphite was found.

14  I should note that there is no evidence that at the time of Mr.

15  Price's arrest, he was in the immediate proximity to the

16  jacket.

17        Defendant moves to suppress this evidence on the

18  basis of the holding of United_States_v._Myers.  In Myers, the

19  court concluded that the search of a duffel bag belonging to

20  the defendant could not be justified as a search incident to

21  arrest when the defendant was lying face down, was handcuffed

22  and guarded by two police officers.  In that case the defendant

23  was approximately three feet from his bag.

24        Myers teaches that in order to justify a search

25  incident to arrest of an object, such as the jacket here, there


                                    54


1  must have been an objective basis upon which to conclude that

2  the warrantless search was necessary for the safety of the

3  officers or to prevent the destruction of evidence.  In short,

4  Myers made it clear that the search incident to arrest is

5  subject to "both geographic and temperoral limitations."

6   Myers at 296.

_____

7         Here, the defendant was outside the garage and

8   handcuffed at the time of the search of his jacket.  In my view

9   this is not a close call given Myers.  The search cannot be

_____

10   justified on an objective basis as borne out of a concern for

11   officer's safety or to preserve evidence.  Consequently, the

12   contraband found in the pocket as a result of that search, that

13   is the sodium hypophosphite, is suppressed.  All right, that's

14   it.

15

16         (Whereupon, at 2:01 p.m., the proceedings were

17   concluded.)

18

19                     - - -

20

21

22

23

24

25

1                C E R T I F I C A T E
                 _ _ _ _ _ _ _ _ _ _ _

2

3

4

5      I, Ronald J. Bench, certify that the foregoing is a

6   correct transcript from the record of proceedings in the

7   above-entitled matter.

8

9

10

11

12   _____

13   Ronald J. Bench

14

15

16

17

18

19

20

21

22

23

24

25